2010 UT App 169

**Dana KEITER, Petitioner and Appellee,**

v.

**John Edward KEITER, Respondent and Appellant.**

**No. 20080766–CA.**

Court of Appeals of Utah.

June 24, 2010.

Clark W. Sessions, Lee A. Killian, and Sarah L. Campbell, Salt Lake City, for Appellant.

Frederick N. Green, Sandy, for Appellee.

Before Judges DAVIS, McHUGH, and ORME.

## OPINION

ORME, Judge:

¶1 In their divorce proceeding, John Edward Keiter (Husband) and Dana Keiter (Wife) disputed whether fifty acres of land (the Property), located in Weber County near the Snowbasin Ski Resort, was marital property. The trial court determined that the Property was marital and ordered an equal distribution of its value. Husband challenges both the adequacy of the factual findings and the sufficiency of the evidence to support this ruling. We determine that the trial court's findings of fact adequately disclose the trial court's analytic steps and that there was sufficient evidence to support the finding that the Property took on a marital character due to commingling. We accordingly affirm the trial court's underlying ruling that the Property took on a marital character. Nonetheless, we remand for a determination of what portion of the Property's value should be considered separate, in light of both premarital and marital funds having been contributed to it, and for the trial court to then divide only the marital value of the Property between the parties, rather than the entire value.

## BACKGROUND

¶2 Husband and Wife were married in 1982. Husband was, at all relevant times, a plastic surgeon. During the marriage, Wife earned a bachelor's degree in theater arts and almost completed her master's degree. The trial court determined that the parties' living and working arrangements centered around a business run by Husband, with Wife staying home to raise the children.

*Bank Accounts and Income*

¶3 Husband and Wife did not have any joint bank accounts during their marriage. Husband had three bank accounts during the marriage: a business account for his medical practice[1] (the medical practice account[2]), an

---

1. As will be indicated in the next part of the Background section of this opinion, Husband practiced medicine in more than one medical practice, or under more than one name, throughout his career. Unless important for background information, however, we generally refer to Husband's practices as his "medical practice."

2. The factual findings indicate that Husband had more than one business account for the medical practice throughout the parties' marriage. The trial court did not draw a distinction among any of these business accounts for the medical practice, nor do we.

account for the retirement plan he administered (the defined benefit plan account), and a personal account. Wife also had a personal account. Husband deposited money he earned from his surgeries and other medical services into his various accounts. The trial court found that Husband often used funds from both his personal and medical practice accounts, irrespective of the business or personal nature of a particular disbursement.

¶ 4 Husband's tax returns from 1999 to 2004, at least those that were produced,[3] showed that Husband's approximate annual income ranged from $204,000 to $386,000. After the divorce proceedings commenced, his tax return in 2005 showed income of $134,500 and in 2006 of $65,000.[4] Husband's medical practice's corporate returns showed gross income in the years of 2001 to 2006 in the approximate range of $665,000 to $962,000.

¶ 5 Husband wrote Wife a check as an "officer" of his medical practice every two weeks, even though Wife was never an officer and apparently did no ongoing work for the medical practice. These checks totaled about $620 monthly. Wife also received child support from her first husband and social security benefits for the parties' youngest child, which funds were deposited into her separate account. An expert testified that the amounts Husband paid to Wife, along with the amount of personal expenses paid from the medical practice account, should have been included as Husband's income on his tax return. The trial court agreed that Husband produced more personal income than he declared and found "such practice deceptive and done for tax advantage[s]." Wife paid household expenses from her personal account. She also used credit cards that Husband provided. Husband admits that "[he] paid family expenses, such as credit card bills, out of the [medical practice account]."

¶ 6 The trial court did not determine whether Husband's medical practice was marital property because the parties had entered into a stipulation regarding the distribution of its value upon Husband's impending retirement.[5] The court approved the parties' stipulation that upon liquidating Husband's medical practice, all net proceeds would be divided equally between the parties.[6]

*Husband's Medical Practice, Husband's Retirement Funds, and the Property*

¶ 7 At the time of the parties' marriage in 1982, Husband had been practicing medicine as a plastic surgeon for some eight years, with another doctor, in a medical practice named Plastic Surgery Associates (PSA). When Husband began practicing with PSA in 1974, he also began contributing to PSA's profit sharing plan (the Profit Sharing Plan) that had been started by the other doctor in 1972 and was administered by attorney Dean Larsen. The trial court found that because of problems that arose later with Larsen and his affiliated entities, "there are simply no existing documents that shed any light on the source or amount of contributions [by Husband] to the [Profit Sharing] Plan."

¶ 8 In 1980, the Profit Sharing Plan was converted to a defined benefit plan, entitled the "John E. Keiter M.D. PC Defined Benefit Pension Plan"[7] (the Defined Benefit Plan), and all of the Profit Sharing Plan's assets were transferred to the Defined Benefit Plan. Shortly thereafter, Larsen suggested that the Defined Benefit Plan purchase

---

3. No tax records were produced for the year 2000.

4. The trial court noted that the drop in income was likely due to a combination of " 'ramping down' due to age" and of what the trial court had "seen . . . in almost every case [it] ha[d] tried where there is a substantial marital estate."

5. Although Husband did not know when he would retire, he "plan[ned] to cease his solo practice no later than his 70th birthday in December 2008 and possibly as early as June 2008."

6. The trial court noted that "based on the testimony elicited and the exhibits produced before the stipulation[, it] likely would have found the medical practice has no value other than the physical and tangible assets of the [medical practice]."

7. Even though not explicitly discussed in the findings, apparently Husband's medical practice took on the name "John E. Keiter M.D. P.C." around that time.

eighty acres of land near Snowbasin, which included the Property. Husband, as trustee of the Defined Benefit Plan, did so jointly with a physician named Clark Summers, with whom Husband was not associated in practice. Summers purchased his interest in the land "through his entity 'Summerhawks.'" Summers and Husband agreed that Husband would own the fifty acre parcel referred to herein as the Property and that Summers would own thirty acres, and each would be responsible for all related expenses in amounts corresponding to their respective ownership shares.

¶ 9 The eighty acres cost a total of $480,000. After making an option payment, a down payment, and a payment within the first six months, the balance owing was $408,000, which Husband and Summers agreed to pay off over ten years with ten percent interest, in annual installments of $47,000. Based on the Defined Benefit Plan's ownership interest in fifty acres, Husband's annual payment was $29,375.

¶ 10 The Defined Benefit Plan was again changed in 1994, well after the parties' 1982 marriage, and at that time the plan contained $1,005,886 in assets in addition to the Property. Two additional participants of the plan "took an unknown distribution and what remained became the 1994 Plan for [Husband]," which "was a defined contribution plan." For various tax reasons, at the time the plan changed in 1994, the Property was distributed to Husband in his personal capacity. Wife's name was never listed on the Property's title, but she did sign a waiver, as a spousal beneficiary under ERISA, when the land was removed from the Defined Benefit Plan. Taxes on the Property were thereafter paid out of Husband's personal account.

¶ 11 Summers completed his payments in 1991 and quitclaimed to Husband, as trustee of the Defined Benefit Plan, any interest Summers had in the Property. Summers took title to his thirty acres. The date on which Husband completed his payments was a factual issue at trial, Husband claiming he paid his portion in full before marrying Wife,

and Wife claiming payments were made during their marriage.

¶ 12 The trial court agreed with Wife and determined the Property became "commingled" during the marriage, based, in part, on five pieces of evidence: (1) a 1988 bank statement for the defined benefit plan account "show[ing] a 'regular withdrawal' of $29,375 (the precise amount of [Husband]'s annual payment under the purchase agreement ...)," with "[a] hand written note on the bank statement by [Husband] show[ing] it was 'Snowbasin land contribution'"; (2) a check from the medical practice account dated September 1987, around the time Husband's annual payment was due, made out to one of the sellers of the Property for $29,-735;[8] (3) a written note, from an unknown source, that showed "[Husband] owed $187,507 and Summers owed $112,504" in 1989, and that "[Husband] made two payments in June 1990," which written note was corroborated to a certain extent by an amortization table; (4) Husband's attorney's statement that Husband "still owed $140,000 toward the Snowbasin property" in 1990,[9] which was also corroborated to a certain extent by an amortization table; and (5) the use of funds from Husband's personal account to pay the taxes on the Property. The trial court also determined that during the marriage, "[t]he [P]roperty [was] modestly improved by the cutting of rough roads," which work was performed by Wife's uncle, who Husband compensated via money or a trade. Also during the marriage, a power line was stubbed on the Property, two wells were dug, and a reservoir was planned, with a total of $158,640 being expended from Husband's medical practice and personal accounts.

¶ 13 In making its conclusion that the Property was marital, the trial court noted "[t]he dearth of records" respecting payments on the Property, which records would have been in Husband's sole possession and control, and particularly the lack of any records showing Husband contributed the full

---

8. The trial court noted that "the last three digits [were] transposed."

9. The trial court reasoned that Husband's counsel "had no way of knowing that apart from what [Husband] told him."

amount he owed before the parties' marriage. The trial court also noted that typically in such circumstances, a negative inference about missing documentation is to be drawn against the party who should have had possession of the records, i.e., that the unproduced records, if produced, would benefit the other party. The trial court also discussed Husband's credibility, stating that although it "d[id] not necessarily 'disbelieve' [Husband]," no evidence supported or corroborated Husband's position.[10] While recognizing that Husband's claim that he paid his portion of the Property's purchase price early was not inherently suspect, the trial court observed that Husband's claim that he paid for the Property in full before the parties' marriage was contrary to the evidence. The court also noted its skepticism, given the evidence, that Husband could have completely paid off his portion of the purchase price so early in his medical career.

¶ 14 Based on a 2006 appraisal, which was the only evidence on current value submitted to the trial court, the court determined that the Property's value was $2,390,000. The court noted, however, that it believed the Property was actually worth more, or would be worth more soon, even considering development costs, because one-acre lots on adjacent property were selling for around one million dollars. Because the trial court determined that the Property was marital, it ordered the parties to divide the value of the Property equally, but it gave the parties some leeway to decide how best to split the Property's value. The court also ordered that the Property be sold by a date certain if the parties could not otherwise agree on a way to equitably divide it.

## ISSUES AND STANDARDS OF REVIEW

¶ 15 Husband first claims the trial court committed reversible error in not characterizing the medical practice as either separate or marital property, even though the parties had already stipulated that the proceeds from the sale of the medical practice would be divided equally. Second, Husband challenges the trial court's characterization of the Property as marital. In making these challenges, Husband attacks both the adequacy of the factual findings to support the legal conclusions and certain factual findings.

¶ 16 Generally, "[t]rial courts have considerable discretion in determining ... property distribution in divorce cases, and will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Stonehocker v. Stonehocker,* 2008 UT App 11, ¶ 8, 176 P.3d 476 (omission in original) (citation and internal quotation marks omitted). "[W]e review the trial court's legal conclusions concerning the nature of property for correctness." *Bradford v. Bradford,* 1999 UT App 373, ¶ 11, 993 P.2d 887, *cert. denied,* 4 P.3d 1289 (Utah 2000).

¶ 17 With regard to the adequacy of a trial court's factual findings,

[f]ailure of the trial court to make findings on all material issues is reversible error unless the facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment. The findings of fact must show that the court's judgment or decree follows logically from, and is supported by, the evidence. The findings should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached.

*Stonehocker,* 2008 UT App 11, ¶ 16, 176 P.3d 476 (citation and internal quotation marks omitted). Furthermore, " '[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' " *Id.* ¶ 9 (quoting Utah R. Civ. P. 52(a)). In challenging the trial court's factual findings, "Husband must first 'marshal the evidence in support of the findings and then demonstrate that the findings are unsupported by substantial evidence.' " *Id.* (citation omitted).

---

10. The trial court also determined that Husband's deceptive practices with regard to claiming reduced income on his tax returns while paying Wife as an "officer" of his medical practice bore on his credibility, although the court also characterized Husband as "an honorable and decent person."

## ANALYSIS

### I. Characterization of Husband's Medical Practice

 ¶ 18 Husband first claims the trial court committed reversible error in failing to specifically determine whether his medical practice was separate or marital property. According to Husband, a characterization of the medical practice as separate or marital property was necessary in order to properly determine whether the Property was marital property. Wife, on the other hand, argues that characterization of the medical practice as marital or separate property was not necessary because the parties stipulated to an equitable disposition of the medical practice and the trial court's ruling on the Property was based on Husband's using income earned during the marriage to make payments toward purchasing and improving the Property, independent of the precise characterization of the medical practice as marital or separate property. We essentially agree with Wife on this issue.

 ¶ 19 Husband does not dispute that his personal income earned during the marriage was marital to a certain extent.[11] And, indeed, earned income from employment or from rendering professional services during a marriage falls within the usual definition of marital property. *See Dunn v. Dunn*, 802 P.2d 1314, 1317–18 (Utah Ct.App.1990) ("Marital property is ordinarily all property acquired during marriage and it 'encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived.'") (citation omitted); *id.* at 1318 (discussing that "accounts receivable, tangible assets, and goodwill of a professional practice ..., *to the extent they were accumulated during the marriage,*" are considered marital in nature, even where the

practice was started prior to the marriage) (emphasis added).

 ¶ 20 Husband also recognizes that the trial court's ruling, in part, was based on its conclusion that marital funds were expended on the Property. Generally, "trial courts are first required to properly categorize the parties' property as marital or separate" before making a property distribution award. *Elman v. Elman*, 2002 UT App 83, ¶ 18, 45 P.3d 176. Nevertheless, when, as here, the trial court based its determination that the Property was marital on Husband's use of marital income to make payments toward the Property, not on whether the practice itself was marital, any error in failing to categorize the medical practice itself as either marital or separate property has no bearing on the underlying issue presented by Husband and, thus, is harmless.

### II. The Property

#### A. Marital Character of the Property

¶ 21 Husband next argues that the trial court erred in determining that the Property was marital property. In so doing, he challenges the sufficiency of the evidence to support the relevant findings and challenges whether the findings as a whole adequately disclosed the analytic steps taken by the trial court in characterizing the Property.

 ¶ 22 Generally, "[p]remarital property, gifts, and inheritances may be viewed as separate property," and the spouse bringing such separate property into the marriage may retain it following the marriage. *Burke v. Burke*, 733 P.2d 133, 135 (Utah 1987). But, this "rule is not invariable." *Id.* "Exceptions to this general rule include whether the property has been commingled, whether the other spouse has by his or her efforts

---

11. Rather, the premise for Husband's argument is that because the medical practice was his separate property, and because he maintained separate accounts, any payments from his personal or medical practice accounts did not expend marital funds. As discussed in section II, *infra,* however, the trial court's findings suggesting that Husband inappropriately commingled his personal income with business income support a conclusion that marital funds were used to make payments on the Property. And in any event, the trial court's factual findings as a whole indicate that the parties enjoyed a comfortable lifestyle, which, with Wife staying home to raise the children, could only have been enjoyed as a result of Husband's earnings underwriting their marital standard of living. This reality belies the notion of strict separation of Husband's personal income once it was deposited into his personal or medical practice accounts as opposed to being transferred to Wife.

augmented, maintained, or protected the separate property, and whether the distribution achieves a fair, just, and equitable result." *Dunn*, 802 P.2d at 1320. Particularly, "[p]re-marital property may lose its separate distinction where the parties have inextricably commingled it into the marital estate, or where one spouse has contributed all or part of the property to the marital estate," *id.* at 1321, or "in extraordinary situations where equity so demands," *Elman*, 2002 UT App 83, ¶ 19, 45 P.3d 176 (citation and internal quotation marks omitted).

■■ ¶ 23 Husband clearly acquired an interest in the Property through the Defined Benefit Plan prior to the parties' 1982 marriage. But as Husband readily acknowledges, Utah case law supports the notion that expending marital funds toward otherwise separate real estate supports a determination of commingling that may convert separate property into marital property. *See Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct.App.1994) (determining that "[e]ven though [the h]usband used inherited funds to pay the down payment on the building, he used substantial marital funds to maintain and augment that asset," and therefore, the trial court did not err in concluding "that the appreciated portion of the asset changed its character from a personal asset to a marital asset" and in awarding the "[w]ife . . . one-half of the appreciation of the building"); *Dunn*, 802 P.2d at 1321 (determining that marital income used to make payments on an airplane resulted in commingling).

■■ ¶ 24 The trial court determined, and the evidence supported, that Husband's marital earned income would be deposited along with his separate earnings into his personal account, medical practice account, or defined benefit plan account. Then, both business and personal expenses would be paid from those accounts "without regard to what . . . was properly paid from such an account." *See generally Kimball v. Kimball*, 2009 UT App 233, ¶¶ 4, 28, 217 P.3d 733 (indicating trial courts can properly look to a party's "actions as a whole" as manifesting an intent regarding whether property or money is separate or marital). Because those accounts were "inextricably commingled" with both separate and marital income, the trial court did not err in determining that payments made from those accounts toward the purchase or improvement of the Property came from marital funds. *Cf. Pusey v. Pusey*, 728 P.2d 117, 118–19 (Utah 1986) (upholding distribution to the wife of a portion of the value of corporate assets where the corporation was formed during the marriage, the husband could not produce any evidence to support his theory about a loan from a nonmarital source, and the husband "commingled corporate and personal funds so that [the trial court] could not trace any assets to any source").

¶ 25 Only Husband's unsubstantiated testimony would support the conclusion that the Property was paid for in full before the parties married. In contrast, considerable evidence showed that income was expended on the Property *during* the marriage, including a check from the medical practice account for one payment towards the purchase of the Property; a bank statement from the defined benefit plan account indicating an annual payment was made toward purchase of the Property; improvements to the Property being paid for with funds from the medical practice account or Husband's personal account; and the payment of taxes on the Property from Husband's personal account. Additionally, evidence produced in the form of written notes and statements indicated that the Property had not been completely paid off before 1990, further disproving Husband's claim that the Property was paid off before the parties' 1982 marriage.

¶ 26 Husband produced no evidence, other than his own testimony, that the Property had been completely paid for before the parties' marriage, and thus, evidence to the contrary reduced his credibility on this matter. In light of this evidence, together with the credibility and evidentiary inferences drawn by the trial court from Husband's lack of documentation, Husband has failed to establish that the trial court's relevant factual findings were clearly erroneous. *See Schaumberg*, 875 P.2d at 603 (stating the "trial court . . . was in a superior position to judge the credibility of the witnesses and to

weigh the evidence"); *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 16, 176 P.3d 476 (" 'Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses' ") (quoting Utah R. Civ. P. 52(a)).

¶ 27 Additionally, we hold that the trial court's factual findings properly disclose its analytic steps. *Cf. Rehn v. Rehn*, 1999 UT App 41, ¶ 6, 974 P.2d 306 ("[T]he trial court must make sufficiently detailed findings of fact on each factor to enable a reviewing court to ensure that the trial court's discretionary determination was rationally based on those ... factors."). The trial court discussed the evidence it relied on; it weighed the evidence in light of the credibility concerns it identified; and then it listed the reasons on which it based its conclusion that the Property was marital, including that marital funds were used to make payments toward it, to pay property taxes on it, and to improve it.[12] We accordingly affirm the trial court's ruling that although Husband clearly acquired an interest in the Property before the parties' marriage, the Property took on a marital character over the course of the marriage.

B. Distribution of the Property's Value

¶ 28 We disagree with the trial court, however, that the entire value of the Property should be divided equally, without first subtracting the value allocable to Husband's clearly demonstrated premarital payments toward the Property. *See Hall v. Hall*, 858 P.2d 1018, 1022–23 (Utah Ct.App. 1993) (determining that it was necessary to remand to the trial court for entry of findings supporting an unequal property division,

or "to divide the proceeds from the sale of the home equally after first subtracting the amount necessary to reimburse the [Wife]'s contribution" to the equity of the home from inherited funds). The postmarriage commingling of funds does not somehow relate back to convert these premarital, separate payments by Husband into marital expenditures, in the absence of corresponding contributions by Wife or enhancement of the value of the Property through her unique efforts. The trial court's findings clearly indicate that Husband made some payments toward the Property prior to his marriage to Wife. To the extent those premarital contributions have been shown by Husband, the value attributable thereto should be allocated to him with the remaining value divided equally between the parties. *See Elman v. Elman*, 2002 UT App 83, ¶ 19, 45 P.3d 176; *Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct.App.1994); *Hall*, 858 P.2d at 1022–23. We hasten to add that Husband does not get a second bite at the evidentiary apple, but rather bears the onus of the inadequacy of his showing at trial and the credibility determinations already made and inferences already drawn by the trial court. We thus remand for the trial court to determine, from the record already before it, what portion of the Property's value should be allocated to Husband by reason of his premarital payments and what portion should be deemed marital, and to adjust the allocation of the Property's value accordingly.

CONCLUSION

¶ 29 The trial court did not commit reversible error in failing to determine whether Husband's medical practice was marital or separate property when the parties entered into a stipulation dealing with distribution of

---

**12.** Husband takes issue with the trial court's factual findings to the extent they inappropriately determined commingling was present based on discussions he and Wife had concerning the Property. He also challenges the trial court's determination that the Property took on an entirely marital character given that it was titled in Husband's name individually. However, even if the trial court inappropriately relied on these particular facts, its commingling determination is amply supported by other evidence, including the expenditure of marital funds toward purchas-

ing or improving the Property. *See generally Salt Lake County v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 21, 89 P.3d 155 (" '[A]n appellate court may affirm a trial court's ruling on any proper grounds, even though the trial court relied on some other ground.' To do so, however, the facts established in the record must be sufficient to support the alternative ground.") (alteration in original) (citations omitted). Husband's concern regarding the entire value of the Property being considered marital is well taken and is dealt with in the next subsection of this opinion.

the medical practice and when a characterization of the medical practice was not necessary to the trial court's conclusion that the Property took on a marital character when marital funds were expended on it. And we agree that the Property took on a marital character when marital funds were used to make payments toward it, to pay its property taxes, and to improve it. We remand, though, for the trial court to determine what portion of the Property's value should be allocated to Husband by reason of his pre-marital payments before evenly dividing the remaining value between the parties.

¶30 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and CAROLYN B. McHUGH, Associate Presiding Judge.