## THE UTAH COURT OF APPEALS

JERRY V. BROWN,
Appellant,

*v.*

YVONNE A. BROWN,
Appellee.

Opinion
No. 20190543
Filed October 29, 2020

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 154403120

Julie J. Nelson, Troy L. Booher, and Alexandra
Mareschal, Attorneys for Appellant

Ron W. Haycock Jr., S. Spencer Brown, and
Scarlet R. Smith, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

ORME, Judge:

¶1      Jerry V. Brown appeals the district court's determination in this divorce proceeding that his dental practice was marital property and that his ex-wife, Yvonne A. Brown, was therefore entitled to half its value. Jerry[1] also appeals the district court's award of $96,409.72 to cover pre-decree expenses Yvonne incurred over nearly a two-year period while the divorce was

---

1. Because the parties share the same surname, we refer to them by their first names, with no disrespect intended by the apparent informality.

pending. We reverse in part, affirm in part, and remand for revision of the divorce decree.

BACKGROUND

¶2     In 1986, Jerry purchased a dental practice and building. By 1996, he had completely paid off the purchase price. During a portion of this ten-year period, Jerry was married to his first wife, with whom he had four children. After Jerry and his first wife divorced, Jerry and Yvonne married in 1996. Yvonne had also been married previously and brought three children into the marriage. In 1999, Jerry and Yvonne had a child together. They divorced in 2011 but remarried approximately one year later.

¶3     Soon after their first marriage to each other, Yvonne began working at the practice. After about a month, however, Jerry and Yvonne decided that it was not a good fit. They determined that Yvonne should stay home and care for their blended family from then on, but she occasionally filled in at the practice on an emergency basis. Regardless of the hours Yvonne worked, the practice paid her a monthly salary, depositing her paycheck into Jerry and Yvonne's joint bank account.

¶4     During both his marriages to Yvonne, Jerry kept the practice's accounts separate from the couple's joint accounts. Jerry testified that he did not "at any time . . . put personal funds from [his] personal account or [their] marital accounts into [the practice]." And Yvonne testified that Jerry was "controlling with finances" and threatened to fire his employees if they discussed the practice's finances with her. Yvonne's sister, who worked at the practice, testified that Jerry kept the finances "quiet" and would not discuss them with Yvonne. She further testified that whenever Yvonne would "come to the office, he'd empty the cashbox and walk across the street and deposit all of the money into the bank."

¶5     In addition to drawing his regular salary, Jerry paid expenses attributable to the marriage, such as the couple's

mortgage payments, vehicle payments, insurance bills, travel expenses, and other obligations, using funds from the practice's account. Jerry also deposited $6,000 from the practice's account into the couple's joint account each month, which Yvonne used to pay household expenses. But because Yvonne did not have access to any other bank accounts, if she needed extra money, she "had to ask for it, and usually it became very heated because [Jerry] controlled all of [the] finances."

¶6 In 2002, Jerry and Yvonne built an $860,000 home that came with a $5,722 monthly mortgage obligation. Around this time, Jerry also renovated the practice's building and financed it solely by a loan secured by the building, which resulted in a $4,000 monthly payment that he paid from the practice's revenue. Yvonne testified that the practice's new debt affected the family's lifestyle, income, activities, and travel. She further explained that they "had to make a lot of sacrifices financially at the time to offset [the] income" that stayed in the practice instead of being used to supplement the available marital funds. And around 2004 or 2005, Jerry attempted to open a second office to expand the practice, which proved unsuccessful. This investment, too, was funded solely by the practice.

¶7 After the couple's first divorce and their subsequent remarriage in 2012, Yvonne began attending school to become an esthetician and eventually obtained her master's degree in that field. Jerry paid for her schooling from the practice's revenue. In 2013, Yvonne opened a spa at the practice, for which Jerry added three rooms to the practice's building. This new spa company was a separate entity from the practice and had a separate bank account. Jerry testified that he spent "well over $200,000" of the practice's revenue on spa equipment to help Yvonne get established.

¶8 In June 2015, the couple separated again. Around this time, Yvonne started another spa company in a different location and moved all the equipment that Jerry had purchased with funds from the practice to this new location. After this

separation, Jerry and Yvonne continued to engage in financial transactions. Jerry had refinanced the practice's building in May 2015 and obtained $200,000, which he was solely responsible for repaying, and gave half—$100,000—to Yvonne. For a time, he continued to deposit $6,000 a month into a bank account for Yvonne. Jerry also kept making monthly payments of $2,200 on a laser he had purchased in 2015 for Yvonne's business until it was paid off in March 2019, even though Yvonne had agreed to make the payments. Jerry also continued to help Yvonne by investing over $120,000 in her new spa company. Jerry testified that he did this because he was "hoping that [they] might be able to work things out because [finances were their] biggest problem," and he hoped that those issues would be resolved if her business became profitable.

¶9     In June 2017, Jerry and Yvonne realized that reconciliation was no longer a possibility and decided to divorce once again. Jerry made two more deposits of $6,000 in June and July into a personal account for Yvonne, and in August he deposited another $4,500. From September through December he deposited only $2,500 a month, and he did not deposit any money from January through July 2018. The court then ordered Jerry, starting in August 2018, to pay Yvonne temporary alimony in the amount of $1,607 per month,[2] which Jerry paid until trial in April 2019.

¶10    After trial, the court entered its findings of fact and conclusions of law, dividing the marital estate and deciding other issues pertinent to the divorce. Only two parts of those findings and conclusions, which were later folded into the divorce decree, are relevant to this appeal. First, the court ruled

---

2. Following trial, the district court found that this amount was too low "because Jerry had significantly understated his income" and ruled that Jerry's actual ability to pay was $2,687 per month. The court established this amount as alimony going forward. The court's alimony determination is not at issue in this appeal.

that "[b]ecause marital funds were expended for the benefit of [the practice, it] was converted from Jerry's separate property to marital property." The court based this ruling on its finding that

> [o]n two occasions, Jerry decided to use income from [the practice] to reinvest in the practice. First, in 2004 or 2005 Jerry opened a second dental office. . . . Opening that office required capital. Accordingly, through [the practice], Jerry secured a loan. The monthly payment on the loan was $2,000. The . . . office was a failed venture. . . . Jerry used income from [the practice] to pay for this failed expansion, thereby decreasing the funds he routinely pulled from [the practice] to pay marital expenses as he routinely had done.
>
> Second, in 2003 during the first marriage Jerry decided to renovate the [practice's building]. The renovation required capital. Jerry used available funds from [the practice] as well as a loan to pay for the renovation. . . . The monthly payment was $4,000. This monthly obligation left less money for Jerry to pull from [the practice] to pay for marital expenses as he routinely had done. According to [Yvonne], the renovation debt reduced the family income and [a]ffected "what we did and how we traveled."[3]

---

3. In view of the brief hiatus between the parties' two marriages, corresponding to only one year in a twenty-three-year period when the parties were otherwise married, in adjudicating their second divorce, the district court essentially evaluated their circumstances as though they were parties to a single continuous marriage. In this atypical circumstance and on the facts of this case, this approach seems entirely reasonable, the parties appear

(continued…)

¶11    Second, the court ruled that Yvonne was entitled to $96,409.72 in "pre-decree reasonable monthly expenses." The court based this amount on the extent to which Yvonne's reasonable expenses from June 2017 until April 2019—found by the court to be $9,464.45 per month—exceeded her monthly income, i.e., the amounts Jerry made available to her, her own earned income, and the amount she received from the sale of a laser. Specifically, it found that

> [Yvonne's] monthly shortfall—for which she should have had access to marital funds but did not—can be calculated.
>
> • For the two months from June and July 2017, [Yvonne's] monthly income was $8,839.92, her earned income plus the $6,000 Jerry paid to her. Her monthly expenses exceeded her income by $624.53 each month, for a total shortfall of $1,249.00.
>
> • For August 2017, [Yvonne's] monthly income was $7,339.92, her earned income plus the $4,500 Jerry paid to her. Her monthly expenses exceeded her income by $2,124.53, the total shortfall for that month.
>
> • For the four months from September to December 2017, [Yvonne's] monthly income was $5,339.92, her earned income plus the $2,500 Jerry paid to her. Her monthly expenses exceeded her income by $4,124.53 each month, for a total shortfall of $16,489.12.

_____

(…continued)

to have acquiesced in it during the course of this proceeding, and neither party challenges it on appeal.

• For the seven months from January to July 2018, [Yvonne's] monthly income was $2,839.92, her earned income. Her monthly expenses exceeded her income by $6,624.53 each month, for a total shortfall of $46,371.71.

• For the ten months from August 2018 to April 2019, [Yvonne's] income was $4,446.92, her earned income plus the $1,607 paid to her by Jerry. Her monthly expenses exceeded her income by $5,017.53 each month, for a total shortfall of $50,175.30.

• Prior to the decree, [Yvonne] sold one of the lasers for $10,000.00 and used this money to pay her monthly expenses.

¶12    Jerry appeals.

ISSUES AND STANDARDS OF REVIEW

¶13    Jerry raises two issues. First, he asserts that the district court erred when it determined that the practice had become a marital asset. "[W]hether property is marital or separate is a question of law," which we review for correctness. *Liston v. Liston*, 2011 UT App 433, ¶ 5, 269 P.3d 169.

¶14    Second, Jerry contends that the district court erred in ordering him to pay Yvonne $96,409.72 in expenses incurred by her during the pendency of the divorce proceeding that were not covered by her income and marital funds. We review property decisions and alimony awards with considerable deference, reversing only where the district court has exceeded the sound exercise of its discretion. *See Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 4, 437 P.3d 1257.

ANALYSIS

I. The Practice

¶15    Jerry argues that the district court erred in concluding that the practice—which was unquestionably his separate property at the outset of his marriage to Yvonne—became a marital asset based solely on the fact that practice funds were frequently used to cover family expenses and, at times, the amount of this marital subsidy was reduced to help expand the practice. "The presumption is that marital property will be divided equally while separate property will not be divided at all." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 32, 392 P.3d 968. "Married persons have a right to separately own and enjoy property, and that right does not dissipate upon divorce." *Id.* "The general rule is that equity requires that each party retain the separate property he or she brought into the marriage, including any appreciation of the separate property." *Dunn v. Dunn*, 802 P.2d 1314, 1320 (Utah Ct. App. 1990). "However, separate property is not totally beyond a court's reach in an equitable property division." *Elman v. Elman*, 2002 UT App 83, ¶ 19, 45 P.3d 176 (quotation simplified). Utah law has identified three circumstances that support an award of separate property to the other spouse. *Lindsey*, 2017 UT App 38, ¶ 33. These circumstances are: (1) "when separate property has been commingled" with marital property; (2) "when the other spouse has augmented, maintained, or protected the separate property"—otherwise known as the contribution exception; and (3) "in extraordinary situations when equity so demands." *Id.*

¶16    Here, the court did not rule that the practice had been commingled[4] with marital property, or that this was an

---

4. We agree that the practice never became a marital asset under the theory of commingling because Jerry kept the practice's accounts and the couple's personal accounts separate at all times. No money ever came back to the practice once it entered

(continued…)

extraordinary situation. Rather, it concluded that the contribution exception applied. The contribution exception may be satisfied in three ways: (1) "when one spouse brings assets into the marriage and the other spouse's prudent investment of those assets substantially increases their value"; (2) "when marital funds are expended or marital debt is incurred for the benefit of one spouse's separate property"; or (3) potentially, "when one spouse works for a business owned by the other spouse but is not paid a wage or salary." *Id.* ¶ 35 (quotation simplified).

¶17   Here, the first contribution variant does not apply because it is undisputed that Yvonne did not play a role in investing the practice's assets to substantially increase their value. The third variant is likewise inapplicable because although Yvonne did work at the practice for a time, she was paid a monthly salary for that work and, indeed, she was paid that salary even when she did not work. Rather, the court relied on the second variation of the contribution exception when it ruled, "Because marital funds were expended for the benefit of [the practice, it] was converted from Jerry's separate property to marital property." This determination was erroneous because it is clear from the record that no marital funds were ever used to benefit the practice; the flow of funds was only in the opposite direction.

¶18   To reach its conclusion, the court determined that money that stayed within the practice became marital property simply because Jerry, having previously been more amenable to using money from the practice to pay for family expenses, reduced the amount of those transfers to help fund expansion of the practice. The court reasoned that the practice was converted to a marital

_____

(…continued)
the parties' personal and joint accounts. Thus, it is clear that the practice was never commingled with marital property, even though practice funds were made available, when Jerry saw fit, to subsidize the marital estate.

asset because funds that were normally diverted from the practice to cover family expenses were instead retained to build the practice. This premise does not satisfy the contribution exception because the practice was at all times a separate asset, and the flow of money went in only one direction: from the practice's accounts to the personal and joint accounts of Yvonne and Jerry. Once this money left the practice and entered these accounts, *that money* then became marital property.[5] *Cf. Keiter v. Keiter*, 2010 UT App 169, ¶ 19, 235 P.3d 782 ("[E]arned income from employment or from rendering professional services during a marriage falls within the usual definition of marital property.").

¶19   But this one-way flow did not convert the source of that money, i.e., the practice, into a marital asset. The practice therefore never lost its separate character because no money from a marital source was ever used for the benefit of the practice, even though the converse was true. *Cf. Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct. App. 1994) (holding that because husband used a marital loan to "maintain and augment" a business asset, that "changed [the asset's] character from a personal asset to a marital asset"). And this is true even though Jerry at times reduced the amount of money that left the practice to help fund the family's expenses. Given that Yvonne's work at the practice was financially compensated—indeed, overcompensated—the only way that the practice in this case could have become a marital asset is if money from Yvonne's and Jerry's personal and joint accounts had been regularly used to shore up the practice or the parties took out a marital debt to fund the practice. *See Lindsey*, 2017 UT App 38, ¶ 35. *Cf. Keiter*, 2010 UT App 169, ¶ 24 (holding that a husband's personal and medical practice's accounts were "inextricably commingled" and both were marital assets because the husband deposited his salary into both accounts and paid for business and personal

---

5. The district court considered Jerry's historical use of business funds to pay marital expenses in calculating alimony.

expenses from both accounts) (quotation simplified). Here, in contrast, the court explicitly found, with our emphasis, that "Jerry decided to use income *from* [the practice] to reinvest *in* the practice." Thus, the practice retained its separate character because the money that became a marital asset after leaving the practice never returned to the practice. Nor were other marital assets used to subsidize the practice.

¶20    Yvonne claims that *Keiter*, 2010 UT App 169, requires affirmance of the district court's decision. There, the husband's income from his medical practice, which income was a marital asset, *see id.* ¶ 19, "would be deposited along with his separate earnings into his personal account [and] medical practice account . . . [t]hen, both business and personal expenses would be paid from those accounts," *id.* ¶ 24. Given this routine, the *Keiter* court determined that both accounts were marital assets because "they were 'inextricably commingled' with both separate and marital income." *Id.* Yvonne claims that the same scenario is present here because Jerry "deposited some income into his joint account with [her], some into a personal bank account, and some into [the practice's] account [and] paid family expenses from each account." But the critical difference between *Keiter* and the case at hand is that in *Keiter* the husband's *salary* was deposited into the medical practice's and the marital account, thus commingling the practice's account with marital funds, and he then used the funds from both accounts to pay for *both* business and personal expenses, thereby using marital funds to support and improve his separate property. That is classic commingling, a theory that the district court here correctly avoided. *See supra* ¶ 16 & note 4.

¶21    Unlike in *Keiter*, Jerry never deposited his salary—marital income—into the practice's account, which would have thereby "inextricably commingled" marital funds with separate funds. *See Keiter*, 2010 UT App 169, ¶ 24 (quotation simplified). Furthermore, Jerry never used marital funds to pay for business expenses, as was the case in *Keiter*. Rather, Jerry's salary left the practice's account and entered his personal account or a marital

account and was never used to cover the practice's expenses, which the district court specifically found when it stated that only the practice's own assets were used to expand the practice. And while personal expenses were often covered with additional funds from the practice's account, this was a one-way flow—no marital funds were ever used to pay for business expenses. The district court therefore erred in treating the practice as a marital asset and awarding Yvonne a portion of the value of the practice.

## II. Pre-decree Expenses

¶22　Jerry next argues that the district court exceeded its discretion by ordering him to "reimburse [Yvonne] for almost all of her claimed expenses during the twenty-two-month[6] pendency of their separation."

¶23　"Prior to the entry of a divorce decree, all property acquired by parties to a marriage is marital property, owned equally by each party." *Dahl v. Dahl*, 2015 UT 79, ¶ 126, 459 P.3d 276. "For this reason, it is improper to allow one spouse access to marital funds to pay for reasonable and ordinary living expenses while the divorce is pending, while denying the other spouse the same access." *Id.*

¶24　Here, the district court ruled that, "[p]ursuant to the rule articulated in *Dahl*, [Yvonne]—like Jerry—was entitled to access marital funds to pay her reasonable monthly expenses incurred while the divorce was pending." The court then ordered Jerry, who effectively had control of the marital funds, to pay Yvonne

---

6. Jerry refers to this period as twenty-two months but it is clear that the time frame in question is actually twenty-three months. This is calculated from the time the couple separated in June 2017 up until trial in April 2019. When including June 2017 and April 2019 in the calculation, this is a twenty-three month period.

for her expenses insofar as they exceeded the income she earned plus amounts Jerry advanced while the divorce was pending. The net amount, with a further offset for the value of a laser she sold for $10,000, amounted to $96,409.72.

¶25    Jerry argues that the district court improperly applied our Supreme Court's holding in *Dahl*. In that case, the Court held that the district court erred in requiring the wife, who was not living in the marital home and had no access to the marital estate during the pendency of the divorce, to repay her ex-husband money that he had paid her from the marital estate during the course of the divorce proceedings for her living expenses. *Id.* ¶ 125. The Court ruled that because these funds came from the marital estate and were used to pay the wife's pre-decree living expenses, she was not obligated to repay the money. *Id.* ¶¶ 128–129.

¶26    Jerry argues that *Dahl* does not apply to this case and does not "stand for the proposition that the spouse with access to the marital estate must pay *all* of the other spouse's living expenses during the pendency of the divorce." This argument reflects a misunderstanding of *Dahl*. The point of *Dahl* is not that only one spouse may have "access to the marital estate" but that both do, and both are entitled to rely on it to cover their "reasonable and ordinary living expenses" pending entry of the divorce decree.[7] *Id.* ¶ 126.

¶27    It is true that *Dahl* is on a slightly different footing than this case. In *Dahl*, our Supreme Court held that the wife did not

---

7. Pursuant to *Dahl*, the marital estate must pay for the "reasonable and ordinary living expenses" of each party during the pendency of their divorce proceedings. *Dahl v. Dahl*, 2015 UT 79, ¶ 126, 459 P.3d 276. While Yvonne's expenses during the relevant period may seem high, Jerry has made no claim that these expenses, as found by the district court, were unreasonable in light of the marital standard of living.

have to repay the money she received from the marital estate, rather than, as here, directing that the marital estate would cover the shortfall in her expenses.[8] The Court in *Dahl* explicitly stated, "Prior to the entry of a divorce decree, all property acquired by parties to a marriage is marital property, *owned equally by each party*," and "it is improper to allow one spouse access to marital funds to pay for reasonable and ordinary living expenses while the divorce is pending, while denying the other spouse the same access." *Id.* (emphasis added). It further elaborated that "allowing both spouses *equal access* to marital funds during the pendency of a divorce promotes the goal of a fair, just, and equitable distribution of marital property." *Id.* (emphasis added) (quotation otherwise simplified). Thus, *Dahl* stands for the proposition that both spouses are entitled to equal access to the marital estate to fund their reasonable and ordinary living expenses pending the divorce. In accordance with this proposition, the district court appropriately ordered the marital estate to reimburse the shortfall in Yvonne's pre-decree living expenses with reference to the expense level it deemed reasonable, to the extent those expenses exceeded her earned income, asset sale, and the diminishing amounts Jerry made

---

8. Jerry characterizes the district court's order to reimburse Yvonne for her monthly expenses as requiring *him* to pay it. But Jerry mischaracterizes what the court actually did. Conceptually, it did not order *him* to pay all her expenses but ordered *the marital estate* to cover Yvonne's expenses, an estate in which Yvonne had equal share and to which she should have had equal access. *See id.* Jerry further argues that he should have to pay only half, at most, of the court's pre-decree expenses award. This argument is unavailing, however, because Jerry took control of the marital estate to continue to cover his own expenses but deprived Yvonne of that same benefit. Thus, Jerry is required to cover the shortfall in Yvonne's living expenses *from the marital estate*, to which he deprived Yvonne access while their divorce was pending.

available to her.[9] At this point, while Jerry might be signing the check, the adjustment is conceptually made from the marital estate—not from funds that are his own separate property. *See supra* note 8.

¶28   Jerry further argues that the district court's award should have been offset by the $100,000 he gave Yvonne in May 2015, the value of the equipment he bought for her spa business, the $120,000 he additionally contributed to her business, and other money that he transferred to her from the practice's accounts. This argument is unavailing. First, the equipment assisted Yvonne in earning an income and paying her bills. That earned income reduced the amount of Yvonne's monthly shortfall. The cost of that equipment cannot, years later, be used as an offset against Yvonne's pre-decree living expenses, especially where Yvonne's earned income already offset those expenses. Second, because the majority of these transactions occurred before the couple's decision in 2017 to seek a divorce, it was not unreasonable for the court to ignore these transactions when making its award for living expenses after that decision was made, as Yvonne was still entitled to the benefit of the marital estate to help cover those living expenses, as was Jerry, up until the divorce decree was entered.[10]

---

9. As explained above, *see supra* ¶ 11, once the decision was made to divorce, Jerry initially channeled $6,000 in marital funds per month to Yvonne, leaving a shortfall of only a little over $600 per month. When that allowance dropped to zero for seven months in 2018, the *monthly* shortfall increased by more than tenfold, to over $6,600.

10. There is, however, an expense that Jerry calls to our attention that is on a different footing, namely the $2,200 monthly payment for a laser that he continued to make even after the couple's June 2017 decision to divorce, and which he continued to pay until March 2019, as specifically found by the district

(continued…)

¶29 The court did, however, make a simple calculating error when it ruled that "[f]or the ten months from August 2018 to April 2019, [Yvonne's] income was $4,446.92, her earned income plus the $1,607 paid to her by Jerry. Her monthly expenses exceeded her income by $5,017.53 each month, for a total shortfall of $50,175.30." Both parties agree that the time period actually amounted to nine months, not ten. Thus, the award corresponding to that period should be reduced by $5,017.53. On remand, the district court needs to adjust its pre-decree expense award accordingly.

CONCLUSION

¶30 The district court erred in concluding that the practice had become a marital asset because no marital funds were used to enhance the practice and the practice had not otherwise lost its character as a separate asset. Beyond a simple calculating error and the apparent oversight detailed in note 10, however, the court did not exceed its discretion in its pre-decree expense

---

(…continued)

court. It is undisputed that Yvonne agreed to make those payments, but she did not do so. The court did not circle back and deal with these payments when determining its award of pre-decree expenses to Yvonne, even though the court allowed an offset for the $10,000 Yvonne realized upon sale of another laser that Jerry financed, which surely seems analogous. Jerry's argument that he should have had a further offset for half of the payments made for this laser during the relevant period is persuasive. (As explained above, and as consistent with the district court's approach, this offset would be only for the payments made between the time the couple decided to divorce in June 2017 and the time Jerry paid off the laser in March 2019.) On remand, the court should deal with this loose end and further adjust the award for Yvonne's pre-decree expenses as may be appropriate.

ruling that required the marital estate to cover the shortfall in Yvonne's reasonable living expenses, as found by the court, because Yvonne had an equal right to the marital estate to pay those expenses.

¶31 We remand to the district court to amend its decree to incorporate appropriate changes, in accordance with this opinion.

———————