**2024 UT App 156**

# THE UTAH COURT OF APPEALS

AMANDA GODFREY,
Appellee,
*v.*
RANDY GODFREY,
Appellant.

Opinion
No. 20210871-CA
Filed October 31, 2024

Third District Court, Silver Summit Department
The Honorable Teresa L. Welch
No. 184500190

Lauren Forsyth, Attorney for Appellant

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      In late 2018, Amanda Godfrey filed for divorce from Randy Godfrey. A three-day trial on issues related to the division of the marital estate, alimony, and child support began in June 2021. Thereafter, the trial court issued its findings of fact and conclusions of law and entered a final decree of divorce. Randy[1] now appeals the trial court's ruling and challenges the court's findings in various respects, arguing that the court abused its

---

1. Throughout this opinion, we refer to the parties by their first names as they share a last name. We intend no disrespect by this apparent informality.

discretion. Because we discern no abuse of the court's discretion on any of the points raised by Randy on appeal, we affirm.

BACKGROUND[2]

*Pretrial Proceedings*

¶2      Amanda and Randy married in October 2006, and together they have three children, all of whom are still minors. During their marriage, the couple primarily resided in Summit County, and they purchased three properties that they refer to as (1) the Snowview Property, (2) the Oakridge Property, and (3) the St. George Property.

¶3      In September 2018, the parties separated, and the following month Amanda filed a petition for divorce, citing "irreconcilable differences." Randy then filed an answer and counter-petition for divorce.

¶4      The matter came before a domestic relations commissioner to discuss competing motions for temporary orders that had been filed by the parties. Following that hearing, the commissioner ordered that one of the couple's savings accounts, which had "an approximate balance of $170,071.14," be divided "equally," and the parties were to "use their respective share" of those funds "for their respective attorney fees and expert fees." Thereafter, Randy filed an objection to the commissioner's recommendation. Due to various scheduling conflicts, a hearing on Randy's objection had to be rescheduled, and the issue eventually was set to be "addressed in the parties' trial."

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Chesley v. Chesley*, 2017 UT App 127, ¶ 2 n.2, 402 P.3d 65 (quotation simplified).

¶5    The parties were able to reach a settlement concerning their three properties prior to trial: Amanda would retain the St. George Property, and Randy would keep the other two—the Snowview Property and the Oakridge Property. But even though Amanda and Randy had decided who would retain "possession of the properties," they had not yet determined "what the equity would be," and they agreed that the "equitable distribution would be determined at the time of trial." Before trial, Randy sold the Snowview Property for $1,050,000.

¶6    In early 2020, Randy asserted the matter was moving more slowly than he would like and requested that the trial court "bifurcate the divorce from the remaining issues in the divorce proceeding." The court granted Randy's motion and thereafter entered a bifurcated decree of divorce. The issues that remained "unresolved" and were certified for trial included child support, alimony, property valuation, debts and liabilities, insurance, taxes, and attorney fees.[3]

¶7    In March 2021, the trial court held a scheduling conference in anticipation of trial, which was supposed to begin the next month. At the beginning of the conference, the court informed the parties that, due to the COVID-19 pandemic, the trial "would not be able to occur in person." Each side requested that the trial be postponed in hopes that an in-person trial could eventually be scheduled. The court granted the parties' request and, after settling on new trial dates, the court turned to "a few of the logistics" that needed to be discussed.

¶8    One of the issues that would be addressed at trial was the equitable distribution of the parties' three properties. Amanda indicated that because "so much time" had passed since the inception of the litigation, she would "like to get some updated

---

3. Prior to trial, the parties were able to resolve issues concerning child custody and parent time.

appraisals" for the Oakridge Property and the St. George Property and she wanted to use her own appraiser for such appraisals.[4] Randy "slightly" objected to this request. He explained that while he had no objection to getting an updated appraisal on the Oakridge Property using the same appraiser that had conducted the earlier appraisal, he was "hesitant to . . . start introducing other appraisers" because doing so could potentially lead to "further disputes regarding appraisal prices." He also indicated that he had "no objection" to getting an appraisal on the St. George Property using a new appraiser because that property had never actually been appraised and because of the location of the property. And if they were getting any updated appraisals, Randy asked that the appraisers also "give their opinion of what the value" of the properties would have been on two additional dates: December 2019, when the parties "made a final agreement on who would be receiving what property," and April 2020, when the bifurcated decree was entered.

¶9     Given the arguments of the parties, the trial court stated it would "permit the expert witness to be substituted," meaning that Amanda could use a different appraiser than the one she had previously disclosed and that it would allow "both sides to submit updated expert reports." The court stated that this decision was based on Utah case law that indicates that, when considering an equitable distribution of property, courts should look to "values based upon the date of the decree," but that due to the delays in this case, and the postponement of the trial, it would be unable to do so without updated appraisals. The court also acknowledged that the parties could, of course, "argue at trial whether or not [the court] should deviate from" valuing the properties based on the date of the decree. Based on this, the court also found that Randy had made a "fair request" regarding the additional appraisal dates and instructed the parties to provide

_____

4. At the time of the scheduling conference, Randy had already sold the Snowview Property.

appraisals related to the properties' values as of both December 2019 and April 2020.

¶10    During the scheduling conference, the trial court also instructed the parties that the "direct examination of witnesses" would be "done by affidavit" and submitted to the court prior to trial.

*The Trial*

¶11    The trial court commenced a three-day bench trial in June 2021. As they had been instructed, the parties submitted the direct examinations of their witnesses through affidavits before the trial began. We briefly describe the evidence presented at trial that is relevant to this appeal.

¶12    In his affidavit, Randy testified that his primary source of income, both before and during the marriage, had been derived from his landscaping and snow removal business, High Country Lawn Care & Snow Removal (High Country), which he started prior to the marriage in 1998. Evidence was then submitted to the court indicating that prior to the parties' marriage, High Country had a value of $238,850.38. In 2019, Randy sold High Country for $1,300,000, giving Amanda $20,000 of the proceeds and keeping the remainder for himself.

¶13    Through her affidavit, Amanda testified that she primarily worked in the home during the marriage and that she contributed to Randy's business even though she "received no income for [her] work at High Country." During trial, Amanda provided various details and evidence that demonstrated her work and contributions toward the success of High Country, stating that she would handle tasks related to "payroll," "invoicing," and "pick[ing] up" and "drop[ping] off" supplies. Amanda considered it to be "a family business," and she testified that she was willing to do "anything that really needed to be done."

¶14 To further demonstrate her contributions to High Country, Amanda submitted copies of various text messages between her and Randy discussing aspects of the business. In several of these messages, Randy instructed Amanda to "update" client accounts, to "[s]top services" for certain clients, what services to "[a]dd to [the] contract" for other clients, and how much to charge each client for the work that was done. And during trial, when presented with these messages, Randy acknowledged they were "work-related," although he tried to argue that Amanda only began doing this work for High Country "after [they] were separated."

¶15 Because Amanda did not earn a steady income during the marriage, the trial court also received evidence related to her earning capacity. To that end, Randy submitted a "vocational assessment" from December 2019, which concluded that Amanda "would be able to earn an annual income of $33,080 in the Park City/Salt Lake City, Utah labor market." There was also evidence that, from time to time, Amanda would receive funds from a trust titled "Robert H. Davis Properties, LLC" (the Family Trust), which were essentially "[t]rust assets that constitute a loan on [Amanda's] inheritance." Furthermore, Amanda testified that, in October 2020, she started "Recharge Retreats," a business that offered clients relaxing weekend getaways. It was not until February 2021, however, that Amanda was able to host her "first paid retreat." But due to the overhead costs, Amanda indicated that she "actually lost money" in the endeavor.

¶16 According to the parties, they were also able to obtain additional income during their marriage by renting out their properties. While the parties' divorce was pending, they did, at various times, continue to rent out these properties.

¶17 The trial court also received evidence concerning the value of the parties' three properties, the possession of which had already been decided through settlement, with only the matter of

the "equitable distribution" left to be decided. As the parties requested, various appraisals of the properties based on different relevant dates were submitted to the court for consideration. As for the most recent appraisals, they demonstrated that as of June 2021, the properties were worth (1) $1,300,000 for the Snowview Property, (2) $3,140,000 for the Oakridge Property, and (3) $1,250,000 for the St. George Property.

¶18   As previously noted, *see supra* ¶ 5, Randy sold the Snowview Property for $1,050,000 before the matter went to trial. Concerning that property, the evidence showed that only Randy's name was on the title, but the parties agreed that Amanda had contributed funds toward the purchase of that property. They disagreed, however, as to the amount of Amanda's contribution. Amanda testified that she contributed a $75,000 down payment toward the purchase of the Snowview Property while Randy claimed Amanda contributed only $50,000. Randy's father also submitted an affidavit stating that he sold the Snowview Property to Randy as an "early inheritance gift," and he stated that it was Randy who made the $75,000 down payment on the property.

¶19   The trial court heard closing arguments from the parties two months after the trial. Before the parties began their arguments, the court listed various issues that it would like further clarification on. In particular, the court noted that the parties were "asking for different calculations in terms" of the three properties, explaining that the disagreement was over "the valuation date of those properties," and asked that the parties "highlight the pertinent law" that they wanted the court to consider when determining "the valuation date that should apply to that certified issue." The court also instructed counsel to include in their proposed findings, which would be submitted following the hearing, "anything that [they] want to based" on their closing arguments.

¶20 Amanda began with income, reiterating that she did not work outside the home and had "very, very limited work experience," and asked that her income be imputed at the minimum wage. She argued the trial court should not rely on the "outdated" and "[un]reliable" vocational assessment because it was "performed in 2019 prior to the economic downturn that transpired with COVID" and "was based on the living circumstance[s]" for Amanda while she was living in Park City "where the wages are higher," but she had since moved to Bountiful.

¶21 Concerning High Country, Amanda believed that she was entitled to half of the proceeds that Randy received when he sold the business because she made significant efforts throughout the marriage toward the maintenance and enhancement of the business.

¶22 As for the properties, Amanda claimed it had been "difficult" for her "to do any type of rental agreements" related to the St. George Property because, even though possession of the property had been awarded to Amanda in the settlement, the title remained in Randy's name. She argued that any future rents she might receive would be "speculative" because the house first needed to be "refinanced," which might result in an increased mortgage and require her to assess whether "the rent" would "meet this new mortgage payment." Amanda further argued that the three properties "should be valued as close to the date of the final Decree of Divorce" as possible.

¶23 Randy argued that "the valuation date for the marital properties should be either (1) December 11, 2019, the date the Parties entered into a final agreement to award each other a certain property, or (2) April 22, 2020, the date when the Court issued the bifurcated Decree of Divorce." In both December 2019 and April 2020, the Snowview Property was appraised at $945,000. The Oakridge Property was appraised in December 2019

at $2,270,000 and in April 2020 at $2,420,000. As for the St. George Property, it was appraised in December 2019 at $1,030,000 and in April 2020 at $1,050,000. Randy did not indicate a preference between the two dates, December 2019 or April 2020; he only asked that the trial court choose one of the earlier dates for the valuation of the properties and not the date of the trial.

¶24 As for High Country, Randy argued this was "premarital property" and that "any equity that accrued during the marriage" should be considered as his separate property and not subject to division. Randy pointed out that throughout the marriage, "the business remained in Randy's name alone, and he remained the sole shareholder of High Country." He also argued that Amanda's "interest[] in assisting him with the business" only began after she filed for divorce, and that her testimony regarding her contributions during the marriage was not credible.

¶25 In Randy's proposed findings, he also mentioned the savings account, which had had a balance of $170,071.14, that the commissioner had ordered to be divided equally between the parties. Randy then acknowledged that he had filed an objection to the commissioner's recommendation, but nowhere in his proposed findings and conclusions did Randy indicate that he was requesting a ruling that would order Amanda to return those funds or that he otherwise receive credit for that amount.

¶26 Following arguments, the trial court took the matter under advisement.

*Findings of Fact and Conclusions of Law*

¶27 After receiving the parties' submissions, the trial court entered its findings of fact and conclusions of law. We summarize those findings and conclusions relevant to the issues on appeal.

¶28 Before making any determinations regarding child support and alimony, the trial court noted that it "must first make factual

findings regarding the Parties' gross monthly incomes." The court began with Amanda, acknowledging her work history and the vocational assessment from December 2019. The court determined that the vocational assessment was only helpful "to the extent [that] it outline[d]" Amanda's "work history, occupation qualifications, education attainment, literacy, age, health, and whether [Amanda] has a criminal record." The court found the "applicability" of the assessment to be limited because it was "outdated," particularly considering that it "was completed prior to the impacts of the COVID-19 Pandemic." Moreover, the assessment was based on Amanda's "job opportunities in the Summit County area," but she had since move to Bountiful, and the assessment did not discuss her job opportunities "in the Bountiful area."

¶29   As for any rental income from the St. George Property, the trial court noted that while it was "marital" property, Randy was "solely listed on the title" and Amanda "was not able to collect rents during the pendency of this case." And because there was "no evidence" that Amanda intended to keep the St. George Property, the court was unable to find that there was "a history of recent rents related" to the property "or a prospect of future rents." The court therefore did not "attribute these rents as income" to Amanda. As for the Family Trust and Recharge Retreats, the court likewise did not consider money Amanda had received from these sources as "income" because the evidence showed that monies from the Family Trust were "a loan on her inheritance," and that payments from Recharge Retreats were "minimal, sporadic, and offset by a number of significant and pertinent costs." Based on the evidence presented, the court determined that Amanda's "income should be imputed at minimum wage at $1,257 per month."

¶30   Based on his historical earnings from High Country, and the regular rental income he had been receiving, the trial court

found that Randy's "gross monthly income for purposes of child support" was $9,589.50.

¶31    Turning to the issue of the parties' three properties, the trial court decided that they should "be valued as close to the date of the final Decree of Divorce," meaning the court would use the appraisals that were conducted in June 2021. Thus, the Snowview Property was valued at $1,300,000, the Oakridge Property was valued at $3,140,000, and the St. George Property was valued at $1,250,000.

¶32    When it came to the division of the sale proceeds of High Country, the trial court found that Amanda's "testimony and evidence was credible in proving that she substantially contributed to the maintenance, enhancement, protection, and increased value of High Country" during the parties' marriage. Based on the evidence at trial and the relevant law, the court found it "equitable" that Amanda should receive "half" of the "proceeds from the sale of High Country, subject to pertinent offsets." As part of those offsets, Randy was credited $238,850.38 as his premarital portion of High Country. After subtracting the remaining offsets, the court concluded that this left "$756,239.62 to be split equally" between the parties.

ISSUES AND STANDARD OF REVIEW

¶33    Randy now challenges the trial court's rulings, arguing that the court abused its discretion in five respects: (1) by allowing Amanda to submit updated appraisals and using experts not previously disclosed, (2) by valuing the parties' properties at the time of trial, (3) by calculating Amanda's income for purposes of child support and spousal support at the minimum wage, (4) by awarding Amanda half of the proceeds from the sale of High Country, and (5) by not addressing Randy's objection to the commissioner's recommendation regarding the division of the savings account.

¶34 We review the first four issues raised by Randy on appeal for an abuse of discretion. *See Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 9, 470 P.3d 479 ("We review a [trial] court's decisions regarding the management of its docket, including whether to grant continuances or extend deadlines, for abuse of discretion."); *Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 7, 461 P.3d 1134 (explaining that a trial court has broad discretion in choosing a date for the valuation of property in a divorce dispute); *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 ("Courts have broad discretion to select an appropriate method of assessing a spouse's income, including determinations of income imputation." (quotation simplified)); *Thorup v. Thorup*, 2024 UT App 93, ¶ 14, 554 P.3d 329 ("[Trial] courts are in the best position to determine whether property is marital or separate, and we defer to their findings of fact in this regard unless clearly erroneous." (quotation simplified)). "Under the abuse of discretion standard, we will not reverse unless the decision exceeds the limits of reasonability." *Dierl v. Birkin*, 2023 UT App 6, ¶ 15, 525 P.3d 127 (quotation simplified), *cert. denied*, 527 P.3d 1107 (Utah 2023).[5]

---

5. This court has inconsistently articulated the standard of review to be applied when reviewing a trial court's determination that property is marital or separate. In some instances, we have treated the lower court's determination deferentially, reviewing the decision only for abuse of discretion, *see, e.g.*, *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 26, 392 P.3d 968 ("We generally defer to a trial court's categorization and equitable distribution of separate property and uphold its determinations in that regard unless a clear and prejudicial abuse of discretion is demonstrated." (quotation simplified)), whereas in other cases we have reviewed the court's determination for correctness, *see, e.g.*, *Fischer v. Fischer*, 2021 UT App 145, ¶ 13, 505 P.3d 56 ("Whether property is marital or separate is a question of law, which we review for correctness."

(continued…)

¶35 As to the final issue raised by Randy, we do not address it because it was not preserved for appeal. *See Horne v. Horne*, 2022 UT App 54, ¶¶ 6, 10, 511 P.3d 1174.


ANALYSIS

I. Expert Discovery and Appraisals

¶36 Randy contends the trial court abused its discretion by allowing updated appraisals of the properties and by allowing Amanda to substitute her expert after discovery deadlines had passed. In general, trial courts are granted "a great deal of

---

(quotation simplified)); *Brown v. Brown*, 2020 UT App 146, ¶ 13, 476 P.3d 554 (same); *Liston v. Liston*, 2011 UT App 433, ¶ 5, 269 P.3d 169 ("Whether property is marital or separate is a question of law, and thus we review the trial court's legal conclusions concerning the nature of property for correctness." (quotation simplified)).

Here, neither party has acknowledged the apparent tension in Utah's caselaw on the subject, and both parties have instead advocated for us to review the trial court's determination for an abuse of discretion. But given the state of our jurisprudence and the nature of the underlying decision, we question whether it would be appropriate to utilize a different standard of review going forward. *See Sawyer v. Department of Workforce Services*, 2015 UT 33, ¶¶ 9, 11, 345 P.3d 1253 (outlining the "analytical framework for choosing the standard of review for mixed questions of law and fact," and stating that under this framework, mixed questions that are more fact-like are reviewed deferentially). Ultimately, because this issue was not briefed and Randy's argument would have been unsuccessful even applying a less deferential standard of review, we do not decide this issue today. However, we note the question does warrant additional consideration in a case where it is fully briefed and presented to the court.

deference in matters of discovery and [appellate courts] review discovery orders for abuse of discretion." *Dahl v. Dahl*, 2015 UT 79, ¶ 63, 459 P.3d 276. Moreover, "trial courts have broad discretion in managing the cases assigned to their courts," *Solis v. Burningham Enters. Inc.*, 2015 UT App 11, ¶ 25, 342 P.3d 812 (quotation simplified), which includes determining whether or not to extend discovery deadlines, *Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 9, 470 P.3d 479.

¶37    The trial in this matter was originally scheduled to take place in April 2021, but due to the COVID-19 pandemic, the trial court informed the parties the trial "would not be able to occur in person." In response, Amanda and Randy each requested that the trial be postponed in hopes that an in-person trial could eventually be scheduled. It was as a result of this postponement—which both parties requested—that the court began to entertain Amanda's request for "updated appraisals" concerning the parties' properties. While Randy did express "hesitan[cy]" at reopening discovery, he also indicated he had "no objection" to an updated appraisal for the St. George Property and had no problem "with [Amanda] finding another appraiser" for that property. Randy even added his own request, asking the court that the appraisers be allowed to "give their opinion of what the value" of the properties would have been on two additional dates: December 2019, when the parties "made a final agreement on who would be receiving what property," and April 2020, when the bifurcated decree was entered.

¶38    In rendering its decision on the parties' requests, the trial court considered the fact that both parties agreed to postpone the trial, along with Utah caselaw indicating that courts should typically value marital property "based upon the date of the decree." *See Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 7, 461 P.3d 1134 ("Generally, the marital estate is valued at the time of the divorce decree or trial." (quotation simplified)). In weighing those factors, the court decided to "permit the expert witness to be

substituted," meaning the appraiser that Amanda had previously disclosed, and that it would allow "both sides to submit updated expert reports." Randy was therefore given an opportunity to respond to any expert report that Amanda submitted. Moreover, the court found it only "fair" that Randy's request also be granted and instructed the parties to provide appraisals related to the properties' values as of December 2019 and April 2020.

¶39   Given the situation, and the opportunities the trial court was providing to each side, enabling them to fully present their arguments at trial, it was not an abuse of discretion for the court to allow updated appraisals of the properties or for Amanda to substitute her appraiser. On these issues, reversal would only be warranted "if there is no reasonable basis for the [trial] court's decision." *Berger v. Ogden Reg'l Med. Center*, 2020 UT App 85, ¶ 15, 469 P.3d 1127 (quotation simplified), *cert. denied*, 474 P.3d 944 (Utah 2020). Here, the court was forced to reschedule the trial due to a global pandemic—a rescheduling that both parties agreed to. But for the court to also follow Utah law as closely as possible, by valuing the properties at the time of trial, updated appraisals were necessary. This was a reasonable basis for the court to grant Amanda's request.

¶40   Moreover, when it came to the issue of "new experts," Randy indicated he would be fine "with [Amanda] finding another appraiser" for the St. George Property, but he was less than clear as to why he did not want a new appraiser assessing the other two properties. Instead, Randy raised his own request, asking that he be allowed to get appraisals for two other dates that he intended to argue the trial court should use in its valuation. With each of these requests, the court apparently found it would be only "fair" that each party be given the opportunity to provide this additional information to the court. When the court granted Randy's request, it seemingly assuaged any concerns he had about reopening discovery. This is supported by our review of the record, which shows that—after the scheduling conference—

Randy never argued the court should not consider the June 2021 appraisals of the properties, which is further evidenced by the fact he cited these values in his proposed findings.

¶41 Accordingly, we discern no abuse of discretion in the trial court's decision to allow Amanda to substitute her expert witness while simultaneously allowing Randy the opportunity to supplement his own disclosures regarding the valuations of the properties.

## II. Valuation Date of the Properties

¶42 The general rule concerning the valuation of a marital estate is that it is "valued at the time of the divorce." *Fischer v. Fischer*, 2021 UT App 145, ¶ 16, 505 P.3d 56 (quotation simplified). In its discretion, however, the trial court may "value the parties' marital assets at a different time, such as that of separation, if it determines that the circumstances so warrant," but "any deviation from the general rule must be supported by sufficiently detailed findings of fact that explain the [trial] court's basis for such deviation." *Knowles v. Knowles*, 2022 UT App 47, ¶ 62, 509 P.3d 265 (quotation simplified), *cert. denied*, 525 P.3d 1258 (Utah 2022).

¶43 Randy argues that the equitable valuation dates of the three properties "should have been the date the parties stipulated to who was awarded the real property (December 2019), or the date of dissolution of the marriage (the bifurcated decree date of April 2020)." Before the trial court and again on appeal, Randy argues that it would be "more reasonable and equitable" for the court to have chosen either of these dates than to have used the date of the final decree.

¶44 After considering Randy's argument, the trial court noted that it was appropriate to value the properties close to the date of the final decree, particularly where the parties "have maintained ownership rights to the properties despite" their settlement

agreement, or "the entry of the bifurcated divorce decree." The court noted that Amanda was "still listed on the title and mortgage of the Oakridge Property, but she has not benefitted from the bifurcation, and she has not been able to remove her name from the title." Furthermore, the court stated that Randy had been "solely listed on the title" of the St. George Property and that, thus, Amanda had been unable "to collect rents during the pendency of this case." This was in accordance with Amanda's argument at trial that she would need to "refinance" the St. George Property in her name, which she had been unable to previously do, meaning the mortgage payments would likely change and any future rent she could receive from this property would be merely "speculative."

¶45 Randy resists this conclusion, arguing that Amanda "exercised control" over the St. George Property and that he likewise "treated the Oakridge [P]roperty and the Snowview Property as his individual properties after the December 11, 2019 agreement" and after the bifurcated decree was entered in April 2020. We are not persuaded that the evidence highlighted by Randy warrants reversal. While Randy places much emphasis on the evidence from trial that favors his position and argues that his testimony was "more credible and accurate" than Amanda's, this does not demonstrate that the trial court abused its discretion in valuing the properties as of June 2021. It is beyond "this court's purview to engage in a reweighing of the evidence"; moreover, "when a foundation for the court's decision exists in the evidence, we *may not* engage in a reweighing of the evidence." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 31, 540 P.3d 727 (emphasis added) (quotation simplified). Indeed, this court will review the rulings of the lower court to determine whether they are supported by the evidence, but "in cases where the appellant has merely pointed to evidence that might have supported findings more favorable to them rather than identifying flaws in the evidence relied on by the [trial] court that rendered the court's findings clearly erroneous, we will not reverse." *Id.* (quotation simplified). This is precisely

what Randy has done in this matter, and his arguments therefore do not warrant reversal.

¶46    Furthermore, Randy raises two additional challenges to the trial court's division of the Snowview Property. First, he contends it was an abuse of discretion for the court to conclude that Amanda "made a $75,000 down payment" on the Snowview Property when her contribution was, in reality, only $50,000. To accept Randy's position, however, would require us to conclude that his evidence was "more credible and accurate" than Amanda's evidence was at trial. This also is something we cannot do on appeal, because this court "may not substitute [its] judgment for that of the trial court" in such matters "as trial courts are in a better position to weigh conflicting evidence and evaluate the credibility of witness testimony." *Lunt v. Lance*, 2008 UT App 192, ¶ 19, 186 P.3d 978. And unless the record demonstrates that the trial court's findings were clearly erroneous, "we accord deference to the trial court's ability and opportunity to evaluate credibility and demeanor." *Salt Lake City v. Northern*, 2013 UT App 299, ¶ 6, 318 P.3d 775 (per curiam) (quotation simplified). Here, Randy has not demonstrated that the court's credibility findings and weighing of the evidence were clearly erroneous.

¶47    Second, Randy contends the trial court abused its discretion in adopting the June 2021 appraisal for the Snowview Property based on its conclusion that Randy "wrongfully sold and dissipated the property prior to trial." This argument fails because Randy ignores that this statement represents only half of the court's finding. That is, the court first concluded that it would use the June 2021 valuation to divide the parties' equity in the Snowview Property since "the time of trial is generally the appropriate valuation date for marital assets." Because we have already determined that the court did not abuse its discretion in reaching this conclusion, the propriety of the court's alternative reason for picking this valuation date is irrelevant.

¶48 Accordingly, we determine that the trial court's decision to value the parties' properties at the time of the divorce, as opposed to another date proposed by Randy, was not an abuse of discretion.

### III. Amanda's Imputed Income

¶49 Randy takes issue with the trial court's determination that Amanda's gross monthly income should be imputed at $1,257 for purposes of calculating child support and alimony. Specifically, Randy asserts that the court failed to consider (1) the vocational assessment from 2019, (2) that Amanda is voluntarily underemployed, (3) the potential rental income from the St. George Property, and (4) money Amanda receives from the Family Trust and Recharge Retreats. For the following reasons, we disagree with Randy that the court's imputation of income was an abuse of discretion.

¶50 Income imputation "is primarily focused on a spouse's ability to produce income," and for that reason, "it is not unusual for courts to impute income to a spouse who has not worked during the marriage (or who has not worked for a number of years preceding the divorce) but who is nevertheless capable of producing income." *Tilleman v. Tilleman*, 2024 UT App 54, ¶ 65, 549 P.3d 65 (quotation simplified). The rationale behind imputation is that courts want to avoid situations where a spouse intentionally becomes unemployed or underemployed in order to manipulate their child support or alimony obligations. *See id.* But "the imputation analysis" should be focused "on the detailed findings of fact necessary to support a decision to impute income rather than the ultimate fact or legal conclusion of voluntary unemployment or underemployment." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 14, 508 P.3d 612 (quotation simplified).

¶51 Concerning the vocational assessment, Randy argues that Amanda "never presented any evidence to rebut the report" or demonstrate "that it wasn't current" or was otherwise unreliable.

Instead, Randy believes the trial court "improperly came up with its own justification without evidence to rebut what [Randy] presented" at trial. On this issue, trial courts "have broad discretion to select an appropriate method of assessing a spouse's income, including determinations of income imputation." *Id.* ¶ 13 (quotation simplified). Randy therefore "bear[s] a heavy burden" on appeal and we will find that the trial court abused its discretion only "if no reasonable person would take the view adopted by the trial court." *Id.* (quotation simplified).

¶52    In its findings, the trial court offered numerous reasons why it chose not to rely on the vocational assessment's conclusions regarding Amanda's earning capacity. For one, the court noted that the assessment was outdated, which meant its usefulness was limited. The court also noted that other events, such as the COVID-19 pandemic and Amanda's move from Summit County to Bountiful, rendered the assessment less reliable. Given the reasons provided by the court, we are not persuaded that it was an abuse of discretion for the court not to rely on the results of the vocational assessment.

¶53    The final two issues that Randy has with the trial court's calculation of Amanda's income are its exclusion of any rental income from the St. George Property and its exclusion of any money Amanda might receive from the Family Trust and Recharge Retreats. As this court has previously held, Utah law requires trial courts to "consider all sources of income when determining alimony," but that "does not dictate that all sources of income be counted as income received by a spouse for that purpose." *Clarke v. Clarke*, 2023 UT App 160, ¶ 29, 542 P.3d 935 (quotation simplified). "Instead, our case law preserves a trial court's broad discretion to treat sources of income as the court sees fit under the circumstances." *Id.* (quotation simplified).

¶54    Moreover, when it comes to these potential sources of income, this court has noted that "courts typically do not expect a

party to use their property in a way they would not otherwise be inclined to." *Rothwell v. Rothwell*, 2023 UT App 50, ¶ 89, 531 P.3d 225, *cert. denied*, 537 P.3d 1011 (Utah 2023). It therefore would not be an abuse of discretion for a court to decline to "impute investment income to a wife for alimony purposes where the evidence showed the parties had a history of reinvesting their investment returns rather than living off them." *Id.* Nor would it be an abuse of discretion for a court to decline to include in its calculation funds that a party "could potentially draw from [their] retirement accounts" or that they "could receive by electing to collect Social Security benefits early." *Id.* (quotation simplified). Simply put, it is within the court's discretion to decline to force a party "to do something with [their] portion of the marital estate that the parties did not do during the marriage." *Id.* ¶ 90.

¶55   In its ruling, the trial court considered the rental income from the St. George Property as well as funds available to Amanda from the Family Trust and potential earnings from Recharge Retreats. Concerning the St. George Property, the court found that Amanda "was not able to collect rents during the pendency of this case," as the title was listed in only Randy's name, and that because there was no evidence that Amanda intended to keep the property, the court was unable to find "a prospect of future rents." As for the Family Trust and Recharge Retreats, the court found that the evidence indicated the "[t]rust assets . . . constitute a loan on [Amanda's] inheritance" and any payments she had received from Recharge Retreats "were minimal, sporadic, and offset by a number of significant and pertinent costs." These findings support the court's decision not to consider these potential sources of income when calculating Amanda's imputed income. Consequently, we find no abuse of discretion in the court's exclusion of income related to the St. George Property, the Family Trust, or Recharge Retreats from its calculations.

¶56 Accordingly, Randy has not demonstrated that the trial court abused its discretion by imputing Amanda's income at $1,257 per month.

## IV. The Business as Separate Property

¶57 Randy also challenges the trial court's decision to award Amanda "half" of the "sale proceeds from the sale of High Country." According to Randy, the court should have found that High Country was his separate property and not subject to division. On this point, given the way the parties have advocated we review this issue, we again defer to the trial court's findings; after all, trial courts "are in the best position to determine whether property is marital or separate," and we will not disturb the court's ruling unless it is clearly erroneous. *Thorup v. Thorup*, 2024 UT App 93, ¶ 14, 554 P.3d 329 (quotation simplified). Because Randy has not established that the court's ruling was clearly erroneous, his challenge fails.

¶58 The general presumption under Utah law "is that marital property will be divided equally while separate property will not be divided at all." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 32, 392 P.3d 968. Therefore, it is typical in divorce matters that "each party retain the separate property he or she brought into the marriage, including any appreciation thereof." *Id.* (quotation simplified). There are, however, three circumstances where Utah courts have allowed a spouse's separate property to be divided between the parties at the time of the divorce: (1) "when separate property has been commingled;" (2) "when the other spouse has augmented, maintained, or protected the separate property;" and (3) "in extraordinary situations when equity so demands." *Id.* ¶ 33. In this matter, the trial court applied the second exception to its division of High Country, stating that "a spouse's separate property may be subjected to equitable distribution when the other spouse has by her efforts and/or expenses contributed to the enhancement, maintenance or protection of that property."

(Citing *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988); *Lindsey*, 2017 UT App 38, ¶ 35.)

¶59 On appeal, Randy's argument is essentially that the evidence at trial was insufficient to establish that Amanda contributed to the success of High Country or that she assisted in "increas[ing] the value of the business." In Randy's view, the trial court should have discounted various exhibits submitted by Amanda and, instead, "given more weight" to the testimony of his trial witnesses. Randy again mistakes the role of this court, which is "not to reweigh the evidence presented at trial"; instead, our task is "to determine whether the court's decision is supported by the evidence." *Merrill v. Merrill*, 2024 UT App 125, ¶ 80 (quotation simplified).

¶60 In this matter, the trial court provided great detail in explaining the reasoning behind its decision to award Amanda half of the proceeds from the sale of High Country. In particular, the court noted that Amanda "credibly testified to doing various tasks and to contributing various monies for High Country" during the marriage, and that Amanda's testimony was "supported by evidence of texts between the Parties regarding various business tasks that [Amanda] did for High Country," along with Amanda's "journal entries that she wrote regarding her work for High Country." The court further noted that Amanda was even "an authorized user for an American Express card for High Country" and that she could "use that card for business purchases." And while some of Randy's employees may not have seen Amanda working for the business, the court found that "the trial evidence as a whole indicate[d] that [Amanda] did in fact substantially work for the business," which was supported by Randy's "own statements (through his texts and trial testimony) . . . that [Amanda] substantially contributed to the maintenance, enhancement, protection, and increased value" of the business during their marriage.

¶61 While Randy might be able to point to conflicting evidence in the record, that is an insufficient basis for this court to set aside the trial court's findings. As we have stated before, "the pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 27, 540 P.3d 727 (quotation simplified).

¶62 The trial court provided sufficient reasoning to support its decision, and we will not reweigh the evidence. We therefore decline to disturb the court's ruling where it was not an abuse of discretion for it to distribute the proceeds from the sale of High Country equally between the parties.

## V. The Financial Account

¶63 Randy argues the trial court "failed to address that [Amanda] had received $85,035" from one of the savings accounts earlier in the litigation. The commissioner had ordered that the savings account with a balance of $170,071.14 be divided equally between the parties, and Randy filed an objection to that recommendation, which was never ruled on. Because Randy either waived or failed to preserve this issue for appeal, we need not address the merits of this argument.

¶64 "An issue is preserved for appeal when it has been presented to the [trial] court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified).

¶65 Moreover, as this court has previously stated, "the mere mention of an issue in the pleadings, when no supporting

evidence or relevant legal authority is introduced at trial in support of the claim, is insufficient to raise an issue at trial and thus insufficient to preserve the issue for appeal." *Janson v. Janson*, 2019 UT App 106, ¶ 24, 448 P.3d 1 (quotation simplified). Accordingly, "a party may waive an issue by relinquishing or abandoning it before the [trial] court, either expressly or impliedly." *Id.*

¶66    In an attempt to demonstrate that he preserved this issue for appeal, Randy points to his affidavit from trial, which stated that "[a]t the temporary orders hearing on February 13, 2019," the commissioner ordered that his account "with a balance of $170,071.14 be divided in half and that half be given to Amanda for her use." But Randy merely stated this as a fact and made no argument that this money should be returned to him. While Randy did mention this savings account in his proposed findings of fact and conclusions of law, there is no indication that he was seeking a return of or a credit for those funds. In fact, if the trial court had chosen to adopt Randy's proposed findings and conclusions in its final ruling, he would not have been credited with the funds he now seeks.

¶67    Because Randy did not present the matter of the division of this particular account to the trial court "in such a way that the court ha[d] an opportunity to rule on it," the issue is unpreserved for appeal. *See Johnson*, 2017 UT 76, ¶ 15 (quotation simplified). Furthermore, the record demonstrates that Randy at least impliedly waived the issue before the trial court "by relinquishing or abandoning it," *see Janson*, 2019 UT App 106, ¶ 24, as was made clear by his proposed findings of facts and conclusions of law. For

those reasons, we decline to address the merits of Randy's argument on this point.[6]

CONCLUSION

¶68    Randy has failed to establish that the trial court abused its discretion in its management of discovery issues, valuation of the marital property, imputation of income, or application of the contribution exception to the distribution of High Country's sale proceeds. He failed to preserve for our review the issue of the savings account that the commissioner had ordered to be divided equally between the parties. We therefore affirm the trial court's rulings in all respects.

————————

6. Randy also raised the issue of attorney fees. The trial court determined that "an award of attorney's fees to either Party is neither necessary nor appropriate," and the parties were therefore ordered to "pay for their own attorney fees and costs." On appeal, Randy requests that if he prevails, and this court vacates the trial court's rulings, we "direct the trial court on remand to evaluate his request for fees." Because Randy has not prevailed and we are not remanding the matter to the trial court, there is no need to make such an instruction.