2025 UT App 19

## THE UTAH COURT OF APPEALS

TAMI KRAJESKI,
Appellee,
*v.*
DAVID L. KRAJESKI,
Appellant.

Opinion
No. 20230174-CA
Filed February 13, 2025

Third District Court, Silver Summit Department
The Honorable Teresa Welch
The Honorable Richard E. Mrazik
No. 194500172

Julie J. Nelson and Aaron R. Harris,
Attorneys for Appellant

Bart J. Johnsen, Nicole A. Salazar-Hall, and Sarah
Jenkins Dewey, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1 After entering their marriage with significant premarital assets, David and Tami Krajeski divorced nine years later. Unable to resolve the terms of their divorce, David and Tami[1] went to trial, which resulted in a significant number of findings of fact and conclusions of law. Among the many decisions rendered, the district court determined that much of David's premarital separate property had been transformed into marital property

---

1. To avoid confusion, we use the parties' given names because they share a common surname.

through commingling. In addition, the district court awarded Tami significant alimony, largely as an attempt to allow her to purchase a house much like she had prior to the marriage, using a Zillow estimate to substantiate her claim and an expense spreadsheet prepared by her lawyer's paralegal, both of which David challenged on evidentiary grounds. Finally, Tami was also awarded attorney fees, and David challenges the legal basis of that award. In large measure, we agree with David that the district court erred or exceeded its discretion in many of these rulings. Accordingly, we reverse and vacate the judgment (decree) and remand the case for further proceedings consistent with this opinion.

BACKGROUND

*The Marriage*

¶2 David and Tami married in 2010, each coming to the union with significant premarital assets. Tami had investment accounts; a house in Park City, Utah; and a house in St. George, Utah. David's wealth was greater, coming largely from two businesses he had started years before: Park City Design Coalition (Design Coalition) and DJK Properties LLC (DJK Properties). David had retired from Design Coalition in 2008, at which point he stopped taking draws from the company but did not dissolve the company. Design Coalition was eventually closed and its assets liquidated in 2014, with the proceeds (approximately $200,000) being transferred to an account that belonged to David—account #0410. DJK Properties, a property management company that remains in business, has no employees but contracts with other parties to find tenants, collect rent, and handle tenant issues for the properties it owns. While David asserts that his involvement with DJK Properties was "not on a day-to-day basis," he was involved in reviewing leases, meeting with an accountant and property manager as necessary, signing checks, and authorizing

payments. David did not receive a "salary" from DJK Properties; instead, he took, in his words, "draws as needed to pay for [his] lifestyle." David also had other premarital property, including a house in Peoa, Utah; a lot in Durango, Colorado; and several retirement and investment accounts.

¶3     Upon marriage, Tami moved out of her Park City residence and into the Peoa house. In 2013, Tami sold the Park City house and placed the proceeds in her own account. Tami and David would occasionally winter at Tami's St. George house. During the marriage, David and Tami purchased another house in St. George—the Ledges property—which was later sold, with some of the proceeds being deposited into account #0557.[2] Those funds were then used to purchase another piece of property in Park City—the Glenwild lot. Also during the marriage, David and Tami opened account #1199, which was a joint account used by the parties for the deposit of tax refunds.

¶4     David and Tami separated in August 2019, and Tami filed for divorce shortly thereafter. After the separation, David opened another account, #1019, into which he deposited funds from the

---

2. David maintains that he alone funded the Ledges property by using money from account #0410 and taking out mortgages on his Peoa house and the Ledges lot. However, he acknowledges that the mortgage on the Ledges lot was secured through another account that Tami owned, but he asserts that "Tami did not contribute any of her own money from that account towards mortgage payments on the Ledges property or improvements to that property."

sale of various items purchased during the marriage, including proceeds from the sale of the Glenwild lot.[3]

*The Divorce*

A.   Division of Financial Accounts, Investments, and Real Property

¶5      In the divorce proceedings, the parties' property and accounts were divided in various ways. We mention here only the division of property relevant to the disputes on appeal.

1.      Accounts #0557 and #9699

¶6      David argued that these accounts represented his separate income and were not marital. But the district court found that David "earned income during the marriage that was distributed for marital needs." Specifically, the court found credible the testimony of Tami's expert that David's earnings during the marriage, which were reported on the parties' joint tax returns, were deposited into these accounts and the parties assumed the tax liabilities related to these earnings. The court also found credible the testimony offered by David's expert that the parties received a tax benefit from filing a joint return by pairing David's

---

3. For the benefit of the reader, we provide this table of the accounts referenced in this opinion:

| Account No. | Description |
|---|---|
| #0410, #9297, #9567, #9568 | Investment accounts; largely treated as one account during the divorce proceedings |
| #9553 | DJK Properties account |
| #0557, #9699 | Marital expense accounts |
| #1199 | Marital tax refund account |
| #1019 | Post-separation account for proceeds from sale of marital property |

income with Tami's losses. As to the source of David's income, the district court found that David worked "approximately 20 hours per week managing DJK [P]roperties" in a variety of capacities. From this finding, the court concluded that David's income from DJK Properties was not passive, and the court was "not persuaded that [David's] management of DJK [P]roperties during the marriage involved no work." Moreover, the district court found significant that "trial evidence indicated that monies from these accounts were used for marital expenses." The district court also found that some funds from the sale of the Ledges property, which had been "financed and developed during the marriage," had been deposited into account #0557. Based on these findings, the court concluded that David's earnings during the marriage were marital income and that the "income in these accounts [was] commingled and lost its separate identity."

2.      Account #9553

¶7      Before trial, the district court entered an order declaring the entity DJK Properties and its debt as David's separate property. However, the district court distinguished DJK Properties, which belonged to David as separate property, from account #9553, which was owned by DJK Properties. While DJK Properties as an entity was not marital property, the district court found credible the testimony of Tami's expert that account #9553 contained "marital funds that were earned during the marriage and declared on the [parties'] joint tax returns." It based this conclusion on evidence that the cash balance in this account "increased from $193,703 in December 2017 to $490,613 in June 2020, reflecting the increase in cash in the account due to [David] decreasing his draws from DJK Properties." Based on David's decision to leave marital funds that he was entitled to receive in account #9553, the district court concluded that the account included marital income—and was thus presumably commingled—and should be "appropriately categorized as a marital asset." Notably, the district court did not find that David's

decision to refrain from taking draws deprived the marriage of needed resources, with the inference being that the parties had other means to meet their needs. In addition, the district court did not find that Tami contributed in any way to DJK Properties.

3.      Accounts #0410, #9297, #9567, and #9568

¶8      The district court found that these accounts had earnings distributed to David from Design Coalition "during the [parties'] marriage in 2014" and contained funds from account #1199, the joint account opened for anticipated tax refund deposits. The court found the testimony of Tami's expert credible, and, in turn, concluded that "there were several transfers between these four accounts that resulted in the funds in the accounts being commingled with marital funds from an accounting perspective, and the funds in the accounts losing their separate identity."

4.      Other Investments and Real Property

¶9      Based on its finding that account #0557 was marital due to commingling, the court concluded that several other business ownership interests David had acquired using funds from that account were also marital and should be equitably divided between the parties.[4]

¶10     The district court determined that the St. George house was Tami's separate property because she had acquired it prior to the marriage. And it concluded that David's separate real property consisted of the Peoa house, the lot in Durango, and the property owned by DJK Properties. The sole piece of marital real property

---

4. David contends that accounts #0410, #9297, and #9568 were used for these investments. Because the court had determined these accounts were also marital due to commingling, the court's conclusion that the ownership interest was marital would remain the same without regard to which account was used.

was the Glenwild lot. The court concluded that it was marital property because money from Tami's bank account was used to "fund a portion" of the Ledges property, which was sold with the proceeds deposited into account #0557; and money from that account was used to purchase the Glenwild lot, making it marital property.

## B. Alimony

¶11 Tami sought alimony. The district court calculated her monthly income from all sources, including imputed income, to be $4,943. But based on Tami's testimony, the court found her monthly expenses to be $17,694.45, which the court deemed "reasonable and credible in light of the marital standard of living." Key to the court's alimony calculation was Tami's testimony that she desired "to purchase a house in Park City that [was] comparable to the one that she had during the marriage so that she [could] be close to family members and friends." Tami supported her alimony claim amount through her testimony, a financial declaration with an accompanying spreadsheet prepared by a paralegal in her attorney's office, and several printouts from Zillow showing houses approximating her premarital Park City house that she sold in 2013. Tami anticipated that her mortgage would be $8,186 based on the values listed on Zillow for Park City houses comparable to her premarital Park City house.

¶12 Based on this evidence, the district court determined that Tami's needs exceeded her income and awarded Tami $12,751.45 per month in alimony.

## C. Attorney Fees

¶13 Prior to trial, the district court ordered David to pay $50,000 in advance to Tami to cover attorney fees, noting that it would require her to repay the fee advancement if it later

determined that she had the ability to pay or that none of the disputed assets were marital. On the later finding that the disputed assets were marital, the court decided that Tami did not need to repay the fee advancement.

ISSUES AND STANDARDS OF REVIEW

¶14 First, David contends that the district court abused its discretion when it determined certain assets were marital property rather than separate property. We "review a district court's factual findings in this regard for clear error, and we review for abuse of discretion its ultimate determination of whether a particular item is separate or marital property." *Thorup v. Thorup*, 2024 UT App 93, ¶ 14, 554 P.3d 329; *see also Godfrey v. Godfrey*, 2024 UT App 156, ¶¶ 34, 57, 560 P.3d 151 (reviewing a district court's determination that a business was marital property deferentially under the abuse of discretion standard); *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 26, 392 P.3d 968 ("We generally defer to a trial court's categorization and equitable distribution of separate property and uphold its determinations in that regard unless a clear and prejudicial abuse of discretion is demonstrated." (cleaned up)); *Thompson v. Thompson*, 2009 UT App 101, ¶ 10, 208 P.3d 539 ("Trial courts are in the best position to determine whether property is marital or separate, and we defer to their findings of fact unless clearly erroneous.").[5]

---

5. While both parties posit that this alleged error should be reviewed for abuse of discretion, both simultaneously suggest that "whether property is marital or separate is a question of law, which we review for correctness." *See Brown v. Brown*, 2020 UT App 146, ¶ 13, 476 P.3d 554 (cleaned up); *see also Liston v. Liston*, 2011 UT App 433, ¶ 5, 269 P.3d 169 ("[W]hether property is marital or separate is a question of law . . . ."). We think the

(continued…)

correctness standard somewhat misses the mark by painting the scene with too broad a brush.

Insofar as we can tell, correctness as the standard of review for determination of property being marital or separate finds its origin in *Jefferies v. Jefferies*, 895 P.2d 835 (Utah Ct. App. 1995), an opinion dating from a period when Utah appellate courts began focusing their attention on articulating standards of review with greater precision. *See id.* at 836 ("Whether a 401(a) plan can be considered marital property is a question of law, which we review for correctness."); *see also State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994) (recognizing the shift to better articulating standards of review), *abrogated on other grounds as recognized by USA Power, LLC v. PacifiCorp*, 2016 UT 20, 372 P.3d 629. But even in the immediate years after *Jeffries*, there appears to have been some reticence to view this issue as purely legal. *See Bradford v. Bradford*, 1999 UT App 373, ¶ 11, 993 P.2d 887 ("This issue *primarily* presents a question of law; therefore, we review the trial court's legal conclusions concerning the nature of property for correctness." (emphasis added)). And during subsequent years, we have moved to a more nuanced standard of review that embraces not only correctness and abuse of discretion, but also one of limited deference for mixed questions of law and fact. We recognized this circumstance in *Godfrey v. Godfrey*, 2024 UT App 156, 560 P.3d 151, where we acknowledged that this "court has inconsistently articulated the standard of review to be applied when reviewing a trial court's determination that property is marital or separate." *Id.* ¶ 34 n.5. Indeed, some opinions have treated the determination of the district court in this regard deferentially, reviewing it for an abuse of discretion, *see, e.g.*, *Thorup v. Thorup*, 2024 UT App 93, ¶ 14, 554 P.3d 329; *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 26, 392 P.3d 968; *Thompson v. Thompson*, 2009 UT App 101, ¶ 10, 208 P.3d 539, while others embrace the older correctness standard, *see, e.g.*,

(continued…)

¶15  Second, David asserts that the district court erred in setting Tami's alimony amount, arguing that it was unsupported by sufficient evidence to prove Tami's needs. "We review a district court's alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion within the bounds and under the standards we have set and has supported its decision with adequate findings and conclusions." *Gardner v. Gardner*, 2019 UT 61, ¶ 16, 452 P.3d 1134 (cleaned up). With respect to the admissibility of evidence supporting the alimony award, two different standards of review apply: "The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence. The second standard of review, abuse of discretion, applies to the trial court's decision to admit or exclude evidence." *Dierl v. Birkin*, 2023

---

*Fischer v. Fischer*, 2021 UT App 145, ¶ 13, 505 P.3d 56; *Brown*, 2020 UT App 146, ¶ 13; *Liston*, 2011 UT App 433, ¶ 5.

Here, while in no way attempting to definitively resolve the matter, we have followed the trend of those cases that regard this issue as a mixed question that is more fact-like, giving rise to a review of deference to the district court's applications of the law to the facts. *See Randolph v. State*, 2022 UT 34, ¶ 24, 515 P.3d 444 ("Fact-like mixed questions generally arise when a district court's application of a legal concept is highly fact dependent and variable. Or when the factual scenarios presented are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out. For this reason, we review fact-like mixed questions deferentially." (cleaned up)). We do not need to definitively decide this nuanced question here because we conclude that the district court's analysis does not withstand scrutiny under any of these standards. But we leave open the prospect of more definitively deciding this question in some future case in which it is briefed by the parties and material to our appellate decision.

UT App 6, ¶ 15, 525 P.3d 127 (cleaned up), *cert. denied*, 527 P.3d 1107 (Utah 2023).

¶16 David's final challenge is that the district court abused its discretion in awarding Tami attorney fees. While "we review the district court's award or denial of fees for abuse of discretion," an "award based on insufficient factual findings is an abuse of discretion and requires remand." *Dahl v. Dahl*, 2015 UT 79, ¶ 168, 459 P.3d 276. And, as relevant here, when a district court misunderstands or misapplies the law, it abuses its discretion. *See Johnson v. Johnson*, 2014 UT 21, ¶ 24, 330 P.3d 704 ("[T]he district court applied the wrong legal standard, and in so doing, abused its discretion."); *see also Featherstone v. Schaerrer*, 2001 UT 86, ¶ 41, 34 P.3d 194 ("[T]he court abused its discretion by applying the wrong legal standard in determining the costs and attorney fees . . . .").

ANALYSIS

I. Property Division

¶17 David first argues that the district court "misunderstood and misapplied Utah law when it concluded that a significant amount of David's premarital, separate property was commingled." We agree with David.

¶18 In Utah, "the presumption is that marital property will be divided equally while separate property will not be divided at all. Married persons have a right to separately own and enjoy property, and that right does not dissipate upon divorce." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 32, 392 P.3d 968 (cleaned up). "Marital property is ordinarily all property acquired during the marriage, whenever obtained and from whatever source derived. Separate property, in contrast, is typically a spouse's premarital property or property received by gift or inheritance during the

marriage." *DeAvila v. DeAvila*, 2017 UT App 146, ¶ 15, 402 P.3d 184 (cleaned up).

¶19 However, separate property is not absolutely insulated from division upon divorce. *See Lindsey*, 2017 UT App 38, ¶ 33 ("Separate property is not totally beyond a court's reach." (cleaned up)). "Three circumstances have been identified under Utah law as supporting an award of separate property at the time of divorce. These exceptions are when separate property has been commingled; when the other spouse has augmented, maintained, or protected the separate property; and in extraordinary situations when equity so demands." *Id.* The district court determined that the first of these circumstances is at issue here. We recently addressed the nature of commingled property:

> Separate property will be considered commingled when it has been mixed in with marital assets to such a degree that it is no longer reasonably possible to distinguish between the separate and marital property. On the other hand, if the marital and premarital interests are still reasonably capable of being traced and identified, then the separate property retains its separate nature and will not be considered commingled.

*Thorup v. Thorup*, 2024 UT App 93, ¶ 24, 554 P.3d 329 (cleaned up). Thus, "this inquiry often turns on whether the property's separate identity can still be traced or accounted for," with the relevant question being "whether the property at issue became so commingled that it could not be segregated from the marital estate." *Id.* (cleaned up). Put another way, "separate property may be considered commingled if it becomes inextricably and untraceably intertwined with marital assets." *Id.*; *see also Dahl v. Dahl*, 2015 UT 79, ¶ 143, 459 P.3d 276 ("[P]remarital property may lose its separate character where the parties have inextricably commingled it with the marital estate . . . .").

¶20 We conclude that the district court abused its discretion in determining that David's separate premarital assets were commingled and had been transformed into marital assets. We address the separate groupings of the accounts and property in turn.

A.     Account #9553

¶21 David takes issue with the district court's reasoning that because he reduced his draws from DJK Properties in 2018 and 2019, account #9553 became marital. David argues that the court's approach was "doubly wrong" because "David's reducing his draws did not render the account marital, and even if it did, no basis exists for awarding Tami a marital share of the entire account." We agree with David that the district court's analysis was flawed.

¶22 The district court relied on *Keyes v. Keyes*, 2015 UT App 114, 351 P.3d 90, which indeed stated, in the district court's words, that "keeping salary or distributions artificially low may be a basis for awarding the other spouse an interest in business assets to which he or she may otherwise not be entitled." Based on this proposition, the court concluded the entirety of account #9553 was a marital asset because it contained income David was entitled to receive. The district court, however, misread *Keyes* to reach this conclusion; simply put, the opinion does not provide the support the district court read into it. If anything, *Keyes* compels a contrary conclusion.

¶23 In *Keyes*, this court remanded a matter for a trial court to enter more detailed findings to support awarding an interest in the inventory of one spouse's business to the other spouse. *Id.* ¶ 31. The wife in *Keyes* had presented evidence that (1) she had helped the business acquire some equipment and (2) the business acquired inventory during the course of the marriage. *Id.* ¶ 5. Based on this evidence, the trial court awarded the wife one-half

of the interest in the business's inventory. *Id.* The *Keyes* court acknowledged that an award of an interest in a business might arise if one spouse "was reinvesting money into the business that should properly have benefited the marriage, for example, by keeping [that spouse's] salary or distributions artificially low." *Id.* ¶ 30. But based on the facts that the underlying business was separate property and the inventory in question was purchased using business resources, this court concluded that the trial "court's findings lack[ed] sufficient detail and enough subsidiary facts to disclose the steps by which the ultimate conclusion was reached." *Id.* (cleaned up).

¶24 Here, we encounter an analogous situation to that in *Keyes*. The draws that David did not take belonged to DJK Properties, which was separate property. And it is obviously true that DJK Properties acquired the money that David did not take during the course of the marriage. We are not persuaded that *Keyes* supports the conclusion that merely leaving money in the account renders that account marital. *Keyes* focused on the wife's assertion that she contributed personally to the entity, an assertion entirely missing in this case. Moreover, there was never any evidence presented that the money David did not take in draws in 2018 and 2019 was needed in the marriage. That the money left in the business "should properly have benefited the marriage" was identified as a crucial factor in in *Keyes. See id.* But here, the district court made no attempt to address how the money David left in DJK Properties would have benefited the marriage if it had been distributed or if the marriage suffered as a result of being deprived of that income. Indeed, there is no finding that the marriage suffered in any way by this action. It could have been just as likely that the parties relied on some other resources or that they simply didn't require these draws to meet their needs. In this sense, as David points out, account #9553 was more akin to a premarital trust fund that one spouse might withdraw money from to pay for marital luxuries. That the spouse should choose in some years to leave money in

the trust fund would not transform the trust fund into marital property.

¶25   Our decision in *Brown v. Brown*, 2020 UT App 146, 476 P.3d 554, further supports our conclusion that the district court's reasoning was flawed. In *Brown*, the lower court had determined that the husband's dental practice had been converted from separate property to marital property because "marital funds were expended for the benefit of the practice." *Id.* ¶ 10 (cleaned up). The lower court based this ruling on its finding that the husband had "on two occasions . . . decided to use income from the practice to reinvest in the practice." *Id.* (cleaned up). The lower court concluded that this diversion of income back into the practice decreased the funds the husband was able pull from "the practice to pay marital expenses as he routinely had done." *Id.* (cleaned up). In addition, the lower court found that reinvesting in the practice reduced marital income and affected the way the couple traveled. *Id.*

¶26   On appeal, the husband argued the lower court erred in concluding that the practice, which had unquestionably been his separate property at the outset of the marriage, "became a marital asset based solely on the fact that practice funds were frequently used to cover family expenses and, at times, the amount of this marital subsidy was reduced to help expand the practice." *Id.* ¶ 15. We agreed with the husband and reversed the ruling of the lower court, which had reasoned that "the practice was converted to a marital asset because funds that were normally diverted from the practice to cover family expenses were instead retained to build the practice." *Id.* ¶ 18. We explained, "[The] one-way flow did not convert the source of that money, i.e., the practice, into a marital asset. The practice therefore never lost its separate character because no money from a marital source was ever used for the benefit of the practice . . . ." *Id.* ¶ 19. We concluded that this was "true even though [the husband] at times reduced the amount of money that left the practice to help fund the family's

expenses." *Id.* Thus, we determined that "the practice retained its separate character because the money that became a marital asset after leaving the practice never returned to the practice. Nor were other marital assets used to subsidize the practice." *Id.*

¶27    While *Brown* was on a slightly different footing from the case at hand because it was analyzed as a contribution case rather than a commingling case, *see id.* ¶ 16, the principle it articulated—that a one-way flow of money does not convert the source of that money into a marital asset—applies here.[6] David received distributions from DJK Properties, an entity declared as separate property. He used those distributions for marital expenses. But he did not take distributions in 2018 and 2019. This mere fact did not create a backflow of marital property into DJK Properties that transformed the account in which that money remained into marital property (whether through contribution or commingling) because—just as in *Brown*—no money from a marital source ever went into account #9553 to be commingled with or to augment DJK Properties' assets. Thus, based on our reasoning in *Brown* alone, we have no trouble concluding that the district court abused its discretion when it deemed account #9553 to be marital.

### B.    Accounts #0557 and #9699

¶28    Because David deposited distributions from DJK Properties into accounts #0557 and #9699, the nature of his work with that company was central to the district court's decision about whether these accounts were marital or separate property. On appeal, David argues that the district court erred when it

---

6. Indeed, the *Brown* court applied commingling principles as an analog in its contribution analysis. *See Brown v. Brown*, 2020 UT App 146, ¶¶ 20–21, 476 P.3d 554. In addition, because the district court in the present case appears to have perhaps conflated the contribution and commingling exceptions throughout its analysis, we find it necessary to refer to both exceptions.

labeled distributions DJK Properties made to David as his earned income. David asserts that the district court ignored evidence that he was retired and relied on contractors to perform DJK Properties' work. We agree with David. On review, the great weight of the evidence (indeed all the evidence that could be properly considered) does not support the district court's findings and conclusions. The district court wrongly relied on a statement that was not in evidence, and the district court once again inappropriately concluded that using funds for marital expenses from an account holding separate property transformed those separate funds into a marital asset.

¶29 In his direct testimony, David asserted that his involvement in DJK Properties had "never been a time-consuming endeavor," but he acknowledged that it involved regularly reviewing leases with a real estate broker and commercial tenants, meeting with an accountant and property manager, signing checks, and authorizing payments. It was from this level of involvement that the court concluded that the money distributed from DJK Properties was not passive income, and it was "not persuaded that [David's] management of DJK [P]roperties during the marriage involved no work." Thus, when David received distributions from DJK Properties during the marriage and used that money to fund his and Tami's lifestyle— as the district court saw it—he "earned income during the marriage that was distributed for marital needs" and the accounts that money was in became marital property.

¶30 Insofar as a district court's conclusions rely on its factual findings, this court will reverse if those findings are "against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *Ashby v. State*, 2023 UT 19, ¶ 46, 535 P.3d 828 (cleaned up). In other words, we reverse a district court's rulings and remand a matter if "it is not clear from the district court's findings that it considered" all the evidence and "fully evaluate[d] that evidence." *See Twitchell v.*

*Twitchell*, 2022 UT App 49, ¶ 19, 509 P.3d 806. "There must be adequate factual findings to reveal how the court reached its conclusions and to establish that the court's judgment or decree follows logically from, and is supported by, the evidence. The touchstone of adequate findings is that they are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Keyes*, 2015 UT App 114, ¶ 29 (cleaned up).

¶31 Here, the district court's determination that the distributions David received from DJK Properties represented earned income was flawed because it was unsupported by the evidence. Both parties testified that David was retired. Furthermore, David testified as follows about DJK Properties:

> The company has no employees; rather, it uses a real estate broker to find potential tenants, an outside accountant to track and handle tenant and building finances as well as collect rent, and an outside property management company to handle all tenant issues, repairs, and maintenance.

> Historically, I have been involved in DJK [Properties] operations, but not on a day-to-day basis; rather, I review leases with my real estate broker and the commercial tenants and meet with the accountant and property manager when necessary to receive reports, sign checks, and authorize payments. My involvement has never been a time-consuming endeavor.

In addition, David testified that he had "never received a salary from DJK Properties; rather, since [he] created DJK Properties, [he] had] taken draws as needed to pay for [his] lifestyle." This means that the money David received from DJK Properties was not remuneration in exchange for work he completed on behalf of the

company; rather, the money was in the form of distributions that he would have received irrespective of his management activity. The district court received testimony to this effect on the nature of these distributions from DJK Properties from David's expert. He explained that the distributions were "investment income that an individual receives for an investment in which they didn't actively and materially participate," which means that "they weren't the driving force behind generating the revenue, they weren't the driving force [behind] the day-to-day management of the asset or the investment." Accordingly, the expert described the distributions from DJK Properties as "passive income from [David's] premarital . . . company."

¶32    Rather than relying on this trial evidence, the district court appeared to rely on a declaration—referenced by Tami in closing argument—that David made early in the divorce proceedings in which he stated that he continued "to work approximately 20 hours per week managing" DJK Properties. But Tami never sought to admit this declaration as evidence, and David was never cross-examined about its apparent inconsistency with his trial testimony. Indeed, David objected that Tami was not allowed, "after completion of trial and the close of evidence," to "present materials outside of the trial record by simply referring to materials on the docket." And then to compound matters, the district court appears to have relied on this extra-record reference in drafting its findings of fact and conclusions of law, where it explicitly quoted David's declaration that he worked "approximately 20 hours per week managing" DJK Properties. But the district court abused its discretion in doing so because it was required to rely on the evidence presented at trial to make its findings of fact. After all, it's axiomatic that a court cannot rely on evidence that has not been properly presented. *See Kunzler v. Kunzler*, 2008 UT App 263, ¶ 17, 190 P.3d 497 ("It is . . . axiomatic that a trial court cannot use statements . . . that were never properly

admitted into evidence at trial as support for a factual finding."); *see also Dahl v. Dahl*, 2015 UT 79, ¶ 121, 459 P.3d 276 ("District courts must . . . enter findings of fact establishing that the court's judgment or decree follows logically from, and is supported by, the evidence." (cleaned up)); *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 231 (Utah 1995); *Acton v. J.B. Deliran*, 737 P.2d 996, 999 (Utah 1987) ("The findings of fact must show that the court's judgment or decree follows logically from, and is supported by, the evidence." (cleaned up)); *Smith v. Smith*, 726 P.2d 423, 426 (Utah 1986); *cf. Taylor v. State*, 2012 UT 5, ¶ 31, 270 P.3d 471 ("It is axiomatic that the jury's verdict must be based on evidence received in open court and not from outside sources." (cleaned up)). Thus, the district court abused its discretion in determining that these two accounts were marital because that determination relied on evidence that was not admitted at trial and ignored contradictory evidence that was admitted at trial.

¶33 The district court also found that "[c]redible trial evidence indicated that monies from these accounts were used for marital expenses." To the extent that the district court relied on evidence that money from these accounts benefited the marital estate to reach its conclusion that these accounts were marital property, it further abused its discretion. To be clear, the use of separate property—which is what the properly admitted evidence indicated the distributions from DJK Properties were—for the benefit of the marital estate does not transform the source of that separate property into marital property. The premise that using one spouse's separate-property bank accounts for marital expenses converts those bank accounts into marital property is, simply put, legally incorrect. As we explained above, this point is clear enough from our jurisprudence. *See Brown v. Brown*, 2020 UT App 146, ¶ 19, 476 P.3d 554 ("But this one-way flow did not convert the source of that money . . . into a marital asset."); *Hall v. Hall*, 858 P.2d 1018, 1021–23 & n.1 (Utah Ct. App. 1993)

(recognizing that a spouse's inheritance remained separate property even though it was used for marital expenses).

¶34 The district court also appears to have been swayed by the fact that the distributions from DJK Properties were reported on the couple's joint tax returns in reaching its conclusion that these accounts were marital. The district court stated that it received testimony that filing jointly benefited the marriage by allowing the couple "to claim a refund for which they otherwise would not have qualified." Again, applying the principle laid out in *Brown*, we fail to see how this fact is relevant to the determination that accounts would be converted into marital assets. In short, that the distributions from DJK Properties were reported on the couple's joint tax returns and may have thereby benefitted the marital estate has no bearing on whether the two accounts in question here were marital.

¶35 Finally, the district court received testimony that some funds from the sale of the Ledges property were deposited into account #0557. The Ledges property, the court noted, had been "jointly financed and developed during the marriage," presumably rendering it marital property. The court summarized the testimony of the experts about this matter as follows:

> [Tami's expert] credibly testified that the funds lost their individual identity when the funds were deposited into the account. And although [David's expert] traced the cash deposits into the account, he did not account for the withdrawals from the account or how the funds were spent. [David's expert] conceded that the funds are "commingled" from an accounting perspective, and that he could not identify which dollars are which in the account. The Court also finds that the fact [David's expert] had to prorate the account demonstrates that the

> funds are commingled and have lost their separate identity.

From this testimony, the court concluded that account #0557 was commingled and had lost its separate identity. This conclusion may have been misguided.

¶36 That an accountant resorts to proration to identify the relative ownership of funds in an account does not necessarily mean that funds are untraceable such that they have become commingled. Indeed, proration has long been accepted as a standard for identifying and allocating an asset that includes marital and separate funds. *See Woodward v. Woodward*, 656 P.2d 431, 433–34 (Utah 1982) (relying on proration for the division of retirement benefits). On remand, the district court should revisit this conclusion to determine whether, on the basis of proration, the funds from the sale of the Ledges property are traceable or whether they have indeed been commingled.[7]

C. Accounts #0410, #9297, #9567, and #9568

¶37 David argues that he held accounts #0410, #9297, #9567, and #9568 long before marrying Tami and that the district court erred in concluding that these accounts were all marital. The court concluded that these accounts were marital due to three circumstances: (1) they contained earnings distributed to David from Design Coalition during the marriage; (2) they contained funds from account #1199, which was a joint account opened during the parties' marriage; and (3) based on the testimony of Tami's expert, several transfers resulted in the funds being commingled with marital funds and the funds in the accounts

---

7. Of course, if the Ledges property is determined to be separate, *see infra* ¶ 42, this analysis will need to be adjusted accordingly.

losing their separate identity. We agree with David that the district court's approach was flawed.

¶38 As to the funds distributed to David from Design Coalition, the great weight of evidence at trial indicated that they were a return on capital rather than earnings. These funds were distributed in late 2014 when Design Coalition closed down. Tami's expert stated that it was "not conclusive, in [his] opinion, as to whether or not those were earnings or just return of capital." David's expert, on the other hand, testified that David received about $200,000 back from Design Coalition when it closed down. Given that this was less cash than the company had at the time of the marriage, David's expert said that it was "reasonable to conclude" this amount represented a "return on capital" and "not income." The court clearly abused its discretion in relying on Tami's expert's noncommittal and uncertain opinion to find that David received earnings from Design Coalition during the marriage, especially given the testimony from David's expert that those funds were a return on investment of separate property. *See generally Ashby*, 2023 UT 19, ¶ 46 ("We will set aside a district court's factual finding as clearly erroneous only if it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." (cleaned up)).

¶39 As to the number of deposits made into these accounts, David's expert and Tami's expert agreed that there were only two: one from Design Coalition and one from account #1199. Given the discrete nature of these deposits, the associated funds would likely not be untraceable so as to render separate-asset accounts #0410, #9297, #9567, and #9568 marital assets through commingling. Instead, they would be easily traceable, and therefore, not sufficient to sustain a finding of commingling.

¶40 Given the lack of evidentiary support for the finding that the deposit from Design Coalition in 2014 represented earnings

rather than a return on investment, we reverse the district court's determination that accounts #0410, #9297, #9567, and #9568 are marital assets.

D.    Other Investments and Property

¶41    With regard to other investments and property being marital, the district court's conclusion that the funds used to complete those transactions were *marital assets* led it to further conclude that the assets obtained with those funds were also marital property. And it is well-established that "marital property ordinarily includes all property acquired during marriage, whenever obtained and from whatever source derived." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 31, 392 P.3d 968 (cleaned up).

¶42    However, if *separate assets* were actually used to complete these transactions, then those newly purchased assets would not be marital property. The presumption that property acquired during marriage is marital property is rebuttable in some circumstances. *See In re Estate of Gorrell*, 765 P.2d 878, 879 (Utah 1988) ("In the absence of proof of actual ownership, property in the marital home is presumed to be held in a tenancy in common, half by the husband, half by the wife. This presumption is rebuttable and reflects the usual realities of the marital relationship." (cleaned up)). Given our serious concerns, as detailed above, about the district court's overall analysis regarding the categorization of marital and separate assets, it appears that the same flawed reasoning permeated the decisions regarding the division of other investments and real property, thus necessitating that we vacate and remand the court's findings and conclusions in this regard. Of primary concern on remand will be the character of the funds (namely, marital or separate) that were used to pay for the Ledges property and the Glenwild lot. The district court appears to have based its conclusion that this real property was marital on the commingling exception. The court explained that the Glenwild lot was purchased using funds

from account #0557, which were available due to the sale of the Ledges property. But Tami testified that her financial contribution to the Ledges property was limited to two mortgage payments over approximately three years, with David assuming all the other costs through loans secured by his separate assets. David testified largely the same about the financial involvement of the parties in the Ledges property.

¶43   While the resolution of this issue is left to the district court on remand, our review of the record seems to indicate that the Ledges property (and, by extension, the Glenwild lot) were acquired by David using his separate assets. In short, these real estate transactions appear to be investments David made using his separate premarital assets. If this is the case, it really doesn't matter if the "mere form" of David's separate property has changed. *See Burt v. Burt*, 799 P.2d 1166, 1169 (Utah Ct. App. 1990). "Conversion from one investment medium to another does not, by itself, destroy the integrity of segregation" or the separate nature of one spouse's property. *Id.* To hold otherwise "would unreasonably discourage the prudent investment" of separate assets. *Id.* "In order to preserve the property's separate character, the [owning spouse] would [if not permitted to invest in different mediums] be required to maintain the property in the same physical form in which it was received, be it securities, real estate, or cash. The law does not require such economic absurdity." *Id.*

¶44   Thus, if only David's separate assets were used to purchase real property or make other investments, that real property or other investments would remain David's separate property. On remand, the determination of whether the other real property and other investments at issue are marital or separate property will be driven by the extent to which the money used to acquire them "is readily traceable" as David's separate property and "has not been commingled." *Id.*

II. Alimony

¶45    David next argues that the district court erred in setting Tami's alimony award because she failed to substantiate her claims regarding the marital standard of living. David specifically finds fault with (1) the district court's admission of an "expenses spreadsheet" prepared by a paralegal in the office of Tami's counsel "purporting to reflect marital spending and [Tami's] needs" accompanied by Tami's failure "to provide the required documentation to support her request for alimony" and (2) the district court awarding Tami alimony for housing based on amounts indicated on Zillow printouts that substantially exceeded the monthly cost of housing incurred during the marriage. Again, we agree with David.

¶46    "Under Utah law, the primary purposes of alimony are: (1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge." *Miner v. Miner*, 2021 UT App 77, ¶ 14, 496 P.3d 242 (cleaned up). "A party seeking alimony bears the burden of demonstrating to the court that the *Jones* factors support an award of alimony." *Dahl v. Dahl*, 2015 UT 79, ¶ 95, 459 P.3d 276. These factors, articulated in *Jones v. Jones*, 700 P.2d 1072 (Utah 1985), are "the financial condition and needs of the recipient spouse, the recipient's earning capacity, and the ability of the payor spouse to provide support," *Fox v. Fox*, 2022 UT App 88, ¶ 20, 515 P.3d 481 (cleaned up). "The most common way for a party to satisfy this burden is for the party to provide the court with a credible financial declaration and supporting financial documentation to demonstrate that the *Jones* factors support an award of alimony." *Wellman v. Kawasaki*, 2023 UT App 11, ¶ 14, 525 P.3d 139 (cleaned up). Merely showing a "recollection of . . . marital expenses" but providing "no financial declaration, no supporting financial documentation, [or] no expert testimony" is not enough. *Dahl*, 2015 UT 79, ¶ 108. Such "unsubstantiated

testimony" does "not satisfy [the] burden of showing . . . financial need." *Id.*

¶47    Here, as part of her testimony, Tami provided the district court with an expenses spreadsheet prepared by a paralegal in the office of her attorney. We acknowledge that there is nothing wrong, per se, with a spreadsheet being prepared by a paralegal. The fault in its admission here was the fact that it was unaccompanied by the underlying documentation, Tami did not separately provide the documentation, and Tami could not answer basic questions about the summary. And when asked how the spreadsheet was created, Tami's counsel simply answered that it was not an unusual practice and that his office did this "on every case." The district court then chose to admit the spreadsheet "[b]ased upon the proffer" it had received. To be clear—there was no "proffer" of evidence made by anyone for the court to accept.[8]

---

8. It should be noted that where a party insists that a witness testify, a trial court may not proceed by proffer. *Kawamoto v. Fratto*, 2000 UT 6, ¶ 9, 994 P.2d 187; *see also* Utah R. Civ. P. 43(a) ("In all trials and evidentiary hearings, the testimony of a witness must be taken in open court, unless otherwise provided by these rules, the Utah Rules of Evidence, or a statute of this state."). Still, proceeding by proffer can be particularly efficient, and where appropriate, parties should be encouraged to employ the procedure. When evidence is going to be received substantively by proffer, the proffering party states what the witness would testify to if called (or what a document would show), and if the opposing party consents, a court can accept the proffer. *See Ashton v. Ashton*, 733 P.2d 147, 153 (Utah 1987) (providing an example of making a proffer of evidence); *see also Morrison v. Walker Bank & Trust Co.*, 360 P.2d 1015, 1017 (Utah 1961); *State v. Pirela*, 2003 UT App 39, ¶ 17, 65 P.3d 307; *Burrell v. Schlesinger*, 459 So. 2d 1195, 1199 (La. Ct. App. 1984) ("A proffer is used to set forth the nature

(continued…)

At most, Tami's counsel explained the usual practice his law office employed to create financial declarations in divorce cases. And, indeed, the court relied on Tami's counsel, with the court stating on the record, "Counsel has testified what information was given." Of course, Tami's counsel was not a sworn witness, and anything counsel said could not be considered substantively as evidence. Even if Tami's counsel had been sworn in as a witness, because he never said that he had reviewed the documentation underlying the data in the spreadsheet, his representations still would not have provided adequate foundation to admit the spreadsheet. In short, there was no foundation laid for the

---

of the evidence . . . ."). As indicated, however, the opposing party can insist that the witness take an oath and actually testify. *See generally* R. Utah R. Evid. 603 ("Before testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience."). When an opposing party agrees that the witness would so testify, but objects to the admissibility of the statements, the trial court can receive the proffer and rule on the objection. *See id.* R. 105 ("If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."); *cf. Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002) ("When a trial judge is presented with a proffer of evidence containing both admissible and inadmissible statements and the proponent of the evidence fails to segregate and specifically offer the admissible statements, the trial court may properly exclude all of the statements."). In this case, Tami's counsel did not make a proffer; rather, counsel made a statement not under oath.

expenses spreadsheet, and the district court erred in admitting it and relying on it as a basis for establishing alimony.[9]

¶48    Of additional concern is the alimony amount awarded for housing costs. This amount—nearly $8,200 per month—was for a house "on the exact same street" as the house that Tami owned before she married David. Not only did David object that this amount was based on a Zillow estimate for a house other than the one Tami had owned before the marriage, he also objected on the basis that Tami's estimated housing cost was based on "nothing else" besides the Zillow documents. The district court erred in its approach on this issue. While we agree with David that the district court should have been more circumspect in its admission of the Zillow printouts, their use is largely irrelevant in the case at hand because the estimates, whatever their source, concerned a house that had nothing to do with the "standard of living that

---

9. The best evidence rule requires the party seeking to prove the contents of a document to introduce the document itself. *See* Utah R. Evid. 1002. If the underlying records are "so numerous, complex or cumbersome that they cannot be conveniently examined by the fact trier, or it would materially aid the court and the parties in analyzing such material," the proponent of the record may admit a summary under rule 1006 of the Utah Rules of Evidence. *See Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2013 UT App 146, ¶ 20, 305 P.3d 171 (cleaned up). But rule 1006 nevertheless requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time or place." Utah R. Evid. 1006. And "to make the required showings, the proponent of a summary must provide a competent witness to establish the necessary foundation for the summary and the underlying records." *Sunridge*, 2013 UT App 146, ¶ 20. This is yet another way in which the court exceeded its discretion in allowing the introduction of the spreadsheet evidence.

existed during the marriage." *See Miner*, 2021 UT App 77, ¶ 14 (cleaned up).[10]

---

10. It's not unheard of for courts to rely on Zillow estimates produced by parties to establish the fair market value of a house in divorce proceedings. *See Lamb v. Lamb*, 2024 UT App 16, ¶ 9 & n.3, 545 P.3d 273; *Cox v. Cox*, 2023 UT App 62, ¶ 40 & n.7, 532 P.3d 128. Setting aside questions we might have about the advisability of the practice in some circumstances, the parties in *Cox* and *Lamb* do not appear to have objected to using Zillow estimates. Indeed, in *Cox*, it is clear that neither party challenged the Zillow estimate as being improper. 2023 UT App 62, ¶ 41. But that's not the case here, and the district court should have been more guarded in admitting the Zillow estimates—especially since there was no foundation to support their admission. Of course, "courts routinely allow owners to estimate the value of their property unless it appears that the owner has no realistic idea of its value." *State v. Christensen*, 2014 UT App 166, ¶ 19, 331 P.3d 1128 (cleaned up). And we see no reason that Tami could not have provided an estimate of the value of her prior house as of the time she owned it and, in that connection, testified that she had consulted Zillow to establish her estimate. But that's not how Zillow was used here. Instead, the district court admitted the Zillow printouts themselves as independent evidence of the value of a house other than the ones they referenced. By doing so, the district court allowed Tami to validate her housing need by directly invoking Zillow's imprimatur without foundation. If Zillow estimates—or valuations from similar websites—are admitted as evidence of housing values, the data and methodology underlying those estimates should be the subject of expert testimony to verify their reliability. *See Ledesma v. Nunez*, No. HHD-FA21-5070087-S, 2023 WL 7635195, at *2 n.1 (Conn. Super. Ct. May 2, 2023) ("An opinion based on property value

(continued…)

¶49 The fundamental problem with the district court's determination concerning the dollar amount of Tami's housing need is that it was made relative to Tami's *premarital* house. The district found the "increased monthly mortgage amount to be reasonable because [Tami] testified that she will seek to purchase a house in Park City that is comparable to the one that she had during the marriage[11] so that she can be close to family members and friends." This may have been what Tami wanted, but using her premarital house as the baseline to get there was error on the court's part. Among the purposes of alimony is "to get the parties as close as possible to the same standard of living that existed *during the marriage*." *Jensen v. Jensen*, 2008 UT App 392, ¶ 9, 197 P.3d 117 (emphasis added) (cleaned up). Given that the purpose of alimony is to approximate the *marital* standard of living, we are hard pressed to understand why the district court sought to restore Tami to her *premarital* standard of living. Just because Tami wanted to live in Park City is not reason enough to create a new standard favorable to her. Of course, Tami is free to live where she wants, but the amount she should receive in alimony is not determined by that desire but by the marital standard of living. There is simply no legal basis to justify making this

_____

estimation websites such as Zillow is no substitute for the expert opinion of a certified real estate appraiser."); *see also Vasko v. County of McLeod*, 10 N.W.3d 482, 494 n.19 (Minn. 2024) (noting that issues such as "price fluctuations highlight the hearsay and foundation issues with relying on real estate website links at trial").

11. As we noted, Tami moved out of the Park City house upon her marriage to David, and she subsequently sold that house and kept the proceeds as her separate property. Thus, while she "had" the Park City house "during" part of the marriage, it was not where she and David lived and did not constitute the marital standard of living insofar as housing was concerned.

determination based on the value of a spouse's premarital residence.

¶50    In contrast to the analysis the court undertook here—namely, looking at Tami's premarital house—the proper consideration should have been to determine what the parties spent for housing and were accustomed to during the marriage. This analysis, if it had been undertaken, would have focused on what Tami was accustomed to, insofar as a residence, in Peoa and, perhaps, in St. George during the marriage. *See Degao Xu v. Hongguang Zhao*, 2018 UT App 189, ¶ 24, 437 P.3d 411 ("It is not an abuse of discretion for a trial court to calculate divorcing spouses' housing expenses by trying to determine what each spouse would need to live in a home of the same size and value as the marital home."); *see also Farnsworth v. Farnsworth*, 2012 UT App 282, ¶ 15, 288 P.3d 298 ("It is undisputed that [the spouse] was accustomed to living in a single-family home on property suitable for keeping horses, making that the appropriate measure of her housing needs.").

¶51    Given these departures from Utah caselaw, we have no trouble concluding that the district court abused its discretion in calculating its award of alimony to Tami. Accordingly, we vacate the alimony award and remand this matter to the district court so that it may conduct a proper alimony analysis.

### III. Attorney Fees

¶52    David's final claim is that the district court abused its discretion by awarding Tami $50,000 in attorney fees. We agree with him.

¶53    Utah law "authorizes courts to award attorney fees and costs in divorce cases if doing so would enable the other party to prosecute or defend the action. Such an award must be based on evidence of the receiving spouse's financial need, the payor

spouse's ability to pay, and the reasonableness of the requested fees." *Dahl v. Dahl*, 2015 UT 79, ¶ 168, 459 P.3d 276; *see also* Utah Code § 81-1-203(1)(a) (stating that in an action for dissolution of marriage, "the court may order a party to pay the costs, attorney fees, and witness fees, including expert witness fees, of the other party to *enable the other party to prosecute or defend the action*" (emphasis added)). *But see id.* § 81-1-203(2) ("In an action to *enforce* an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may award costs and attorney fees upon determining that the party substantially *prevailed* upon the claim or defense." (emphasis added)). However, the "party requesting an award of fees has the burden of providing such evidence." *Dahl*, 2015 UT 79, ¶ 168; *see also* Utah R. Civ. P. 102(a) ("In [a divorce] action . . . , either party may move the court for an order requiring the other party to provide costs, attorney fees, and witness fees, including expert witness fees, to enable the moving party to prosecute or defend the action. The motion shall be accompanied by an affidavit setting forth the factual basis for the motion and the amount requested."). In the context of an attorney fees award in a divorce proceeding, "when determining the financial need of the requesting spouse, we generally look to the requesting spouse's income, including alimony received as the result of a divorce decree; the property received via the property distribution award; and his or her expenses." *Dahl*, 2015 UT 79, ¶ 170 (cleaned up).

¶54  Here, the district court appears to have been slightly inexact about the standard for awarding fees. The $50,000 fee award was granted pre-trial, which the court stated was "subject to . . . being repaid" if the court found that Tami had the "ability to pay or that nothing [was] marital." Then, in its findings of facts and conclusions of law, the court doubled down on this statement, noting "that it would require [Tami] to repay the fee advancement if it determined that she actually had the ability to pay or found that none of the disputed assets were marital." The court went on

to decide that Tami did "not need to repay the prior attorney fee advancement" because the court had found that "the disputed assets were marital." These statements miss the mark. As our caselaw makes clear, the award of fees in a divorce action "must be based on evidence of the receiving spouse's financial need." *Id.* ¶ 168 (cleaned up). The award has nothing to do with whether the assets in dispute are marital. By considering whether Tami had succeeded in showing the assets were marital, a decision we substantively vacate with this opinion, the court essentially analyzed the award of the fees under a prevailing-party standard. Applying the prevailing-party analysis to fees in a divorce action (as opposed to a post-divorce enforcement action) is simply wrong.

¶55 Tami's obligation to repay the advanced fees is not determined by whether the disputed assets were marital but by evidence of her financial need, David's ability to pay, and the "reasonableness of the requested fees." *See id.* (cleaned up). Accordingly, we remand the matter of attorney fees to the district court so that it may conduct the proper analysis to resolve this question.

CONCLUSION

¶56 We reverse and vacate the district court's decisions that David's premarital property became marital through commingling, its award of alimony, and its award of attorney fees. We remand these matters for further consideration so that the district court may resolve them in a manner consistent with this opinion.

———————